Filed 9/18/2023 (ep)

Pro Se 2 (Rev. 12/16) Complaint and Request for Injunction

# UNITED STATES DISTRICT COURT

for the

District of

Division

|  |  |  |
|---|---|---|
| Emmanuel Adewale Adeyinka | ) | Case No. $3:23-CV-1350-HZ$ |
| | ) | *(to be filled in by the Clerk's Office)* |
| *Plaintiff(s)* | ) | |
| *(Write the full name of each plaintiff who is filing this complaint.* | ) | |
| *If the names of all the plaintiffs cannot fit in the space above,* | ) | |
| *please write "see attached" in the space and attach an additional* | ) | |
| *page with the full list of names.)* | ) | |
| -v- | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Texas Vital Statistics | ) | |
| *Defendant(s)* | ) | |
| *(Write the full name of each defendant who is being sued. If the* | ) | |
| *names of all the defendants cannot fit in the space above, please* | ) | |
| *write "see attached" in the space and attach an additional page* | | |
| *with the full list of names.)* | | |

## COMPLAINT AND REQUEST FOR INJUNCTION

**I.     The Parties to This Complaint**

**A.     The Plaintiff(s)**

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

| | |
|---|---|
| Name | Emmanuel Adeyinka |
| Street Address | 10811 Richmond Ave 18 |
| City and County | Houston |
| State and Zip Code | Texas 77042 |
| Telephone Number | 503-929-5219 |
| E-mail Address | daysnews94@gmail.com |

Pro Se 2 (Rev. 12/16) Complaint and Request for Injunction

**B.     The Defendant(s)**

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | Texas Vital Statistics |
| Job or Title *(if known)* | Department of State Health Services Attn:Special Investigation |
| Street Address | P.o.Box 149347 |
| City and County | Austin TX |
| State and Zip Code | 78714-9347 |
| Telephone Number | 888-963-7111 |
| E-mail Address *(if known)* | |

Defendant No. 2

| | |
|---|---|
| Name | Dawn K Martin |
| Job or Title *(if known)* | Professor |
| Street Address | 1100 W. 49th |
| City and County | Austin TX |
| State and Zip Code | 78756 |
| Telephone Number | 512-776-2750 |
| E-mail Address *(if known)* | Dawn.Martin1@dshs.Texas.gou |

Defendant No. 3

| | |
|---|---|
| Name | Allen, Riba |
| Job or Title *(if known)* | Manager |
| Street Address | 1100 W 49th |
| City and County | Austin TX |
| State and Zip Code | 78756 |
| Telephone Number | 512-776-2669 |
| E-mail Address *(if known)* | Riba.Allen@dshs.Texas.gou |

Defendant No. 4

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |

Pro Se 2 (Rev. 12/16) Complaint and Request for Injunction

E-mail Address *(if known)*      _____

## II.    Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power).  Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties.  Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case.  Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case.  In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction?  *(check all that apply)*

☒ Federal question                    ☐ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A.    If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

A private person subjected to unlawful racial profiling may seek remedies under 42 U.S.C. § 1983 (Section 1983), which protects persons from "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.

42 U.S. Code § 1983 - Civil action for deprivation of rights

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

18 U.S. Code § 241 - Conspiracy against rights

If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or

If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured—

They shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, they shall be fined under this title or imprisoned for any term of years or for life, or both, or may be sentenced to death.

(June 25, 1948, ch. 645, 62 Stat. 696; Pub. L. 90–284, title I, § 103(a), Apr. 11, 1968, 82 Stat. 75; Pub. L. 100–690, title VII, § 7018(a), (b)(1), Nov. 18, 1988, 102 Stat. 4396; Pub. L. 103–322, title VI, § 60006(a), title XXXII, §§ 320103(a), 320201(a), title XXXIII, § 330016(1)(L), Sept. 13, 1994, 108 Stat. 1970, 2109, 2113, 2147; Pub. L. 104–294, title VI, §§ 604(b)(14)(A), 607(a), Oct. 11, 1996, 110 Stat. 3507, 3511.)

18 U.S. Code § 1924 - Unauthorized removal and retention of classified documents or material

(a)

Whoever, being an officer, employee, contractor, or consultant of the United States, and, by virtue of his office, employment, position, or contract, becomes possessed of documents or materials containing classified information of the United States, knowingly removes such documents or materials without authority and with the intent to retain such documents or materials at an unauthorized location shall be fined under this title or imprisoned for not more than five years, or both.

(b)

For purposes of this section, the provision of documents and materials to the Congress shall not constitute an offense under subsection (a).

(c)

In this section, the term "classified information of the United States" means information originated, owned, or possessed by the United States Government concerning the national defense or foreign relations of the United States that has been determined pursuant to law or Executive order to require protection against unauthorized disclosure in the interests of national security.

(Added Pub. L. 103–359, title VIII, § 808(a), Oct. 14, 1994, 108 Stat. 3453; amended Pub. L. 107–273, div. B, title IV, § 4002(d)(1)(C)(i), Nov. 2, 2002, 116 Stat. 1809; Pub. L. 115–118, title II, § 202, Jan. 19, 2018, 132 Stat. 19.)

Birthright citizenship in the United States

For laws regarding U.S. citizenship, see United States nationality law. For U.S. citizenship (birthright and naturalized), see Citizenship of the United States.
United States citizenship and immigration

Immigration
- Immigration to the United States
- Emigration from the United States
- Immigration policy of the United States
- Effects of immigration to the United States
- Permanent Residency (Green Card)
- Refugees and asylum
- Diversity Immigrant Visa
- Illegal immigrants
- Deportation of Americans from the United States

Citizenship
- Oath of Allegiance
- Birthright citizenship
- U.S. citizens / nationals
- Citizenship test
- Passports
- Relinquishment of nationality
- Honorary citizenship

Agencies
- USCIS
- ICE

Legislation
- United States nationality law

History
- Colonial nationality law
- Naturalization Act of 1790
- Civil Rights Act of 1866
- United States v. Wong Kim Ark
- Indian Citizenship Act
- Nationality Act of 1940

Relevant legislation
- Citizenship Clause
- Immigration and Nationality Act of 1952 / 1965
- Immigration Reform and Control Act of 1986
- Immigration Act of 1990
- Child Citizenship Act of 2000

United States portal

- v
- t
- e

United States citizenship can be acquired by birthright in two situations: by virtue of the person's birth within United States territory or because one or both of their parents is (or was) a US citizen. Birthright citizenship contrasts with citizenship acquired in other ways, for example by naturalization.[1] Birthright citizenship is guaranteed to most people born on U.S. territory by the first part of the Citizenship Clause introduced by the Fourteenth Amendment to the United States Constitution (adopted July 9, 1868), which states:
"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."
The Amendment overrode the Supreme Court decision in Dred Scott v. Sandford (1857) that denied US citizenship to African Americans, whether born in the United States or not, and whether a slave or a free person.[2] Pursuant to the Fourteenth Amendment and the Immigration and Nationality Act (INA) a person born within and subject to the jurisdiction of the United States automatically acquires US citizenship, known as jus soli ("right of the soil").[3] This includes the territories of Puerto Rico, the Marianas (Guam and the Northern Mariana Islands), and the U.S. Virgin Islands.[4][5] The "subject to the jurisdiction thereof" clause excluded Native Americans living under tribal sovereignty, and U.S.-born children of foreign diplomats. Birthright citizenship was later extended to U.S.-born Native American subjects by the Indian Citizenship Act of 1924. Federal law also grants birthright citizenship to children born elsewhere in the world to U.S. citizens (with certain exceptions), known as jus sanguinis ("right of blood").
Some people oppose the application of birthright citizenship to children of illegal aliens.[6] Some argue citizenship is not guaranteed by the Fourteenth Amendment to the children of illegal aliens, but this interpretation has never been endorsed by federal courts. The Pew Hispanic Center estimates that approximately 7.5% of all births in the U.S. (about 300,000 births per year) are to illegal aliens.[7] The Pew Hispanic Center also estimates that there are 4.5 million children born to illegal aliens who received citizenship by birth in the United States, while the Migration Policy Institute estimates that there are 4.1 million children. Both estimates exclude anyone 18 and older who might have benefited.[7][8]
On January 24, 2020, the Trump administration adopted a policy to make it more difficult for pregnant foreign women to come to the US where it is suspected that the purpose is to give birth on US soil and thereby to ensure their children become US citizens, a practice commonly called "birth tourism".[9]
Current U.S. law[edit]
Citizenship in the United States is a matter of federal law, governed by the United States Constitution. Since the adoption of the Fourteenth Amendment to the United States Constitution on July 9, 1868, the citizenship of persons born in the United States has been controlled by its Citizenship Clause, which states: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."[10]
Statute, by birth within U.S.[edit]
Under United States Federal law (8 U.S.C. § 1401), a person is a United States national and citizen if:
- the person is born in the United States, and subject to the jurisdiction thereof
- the person is born in the United States to a member of an Indian, Inuit, Aleutian, or other aboriginal tribe (see Indian Citizenship Act of 1924)
- the person is of unknown parentage found in the United States while under the age of five years, until shown, prior to his attaining the age of 21 years, not to have been born in the United States
- the person is born in an outlying possession of the United States of parents one of whom is a citizen of the United States who has been physically present in the United States or one of its outlying possessions for a continuous period of one year at any time prior to the birth of such person.
U.S. territories[edit]
The Fourteenth Amendment applies to incorporated territories, so people born in incorporated territories of the U.S. are automatically U.S. citizens at birth.[11]
There are special provisions governing children born in some current and former U.S. territories or

possessions, including Puerto Rico, the Panama Canal Zone, the Virgin Islands, Guam, and the Northern Mariana Islands. For example, 8 U.S.C. § 1402 states that "All persons born in Puerto Rico [between] April 11, 1899, and ... January 13, 1941 ... residing on January 13, 1941, in Puerto Rico ... [and] persons born in Puerto Rico on or after January 13, 1941, ... are citizens of the United States at birth."[12]

According to congressional enactment, persons born in American Samoa are American nationals but not U.S. citizens. A 2016 ruling by the D.C. Circuit Court upheld the United States government's position interpretation that American Samoa is not "in the United States" for purposes of the Fourteenth Amendment and thus American Samoans are nationals but not citizens at birth,[13] A 2021 ruling by the 10th Circuit Court similarly upheld the government's position and reversed a lower court ruling that said American Samoan plaintiffs were United States citizens at birth.[14][15]

Outlying possessions[edit]

According to 8 U.S.C. § 1408 persons born (or found, and of unknown parentage, under the age of 5) in an outlying possession of the U.S. (which is defined by 8 U.S.C. § 1101 as American Samoa and Swains Island) are U.S. nationals but not citizens, unless otherwise provided in section 1401. The U.S. State Department publication titled Historical Background to Acquisition by Birth in U.S. Territories and Possessions explains the complexities of this topic.[16]

U.S. waters and airspace[edit]

A child born in U.S. waters or airspace is a U.S. citizen by birth. See 8 FAM 301.1–4 ("Birth in U.S. Internal Waters and Territorial Sea"),[17] 8 FAM 301.1–5 ("What Is Birth in U.S. Airspace?"),[18] and 8 FAM 301.1–6 ("Documenting Birth in U.S. Waters and U.S. Airspace").[19]

Statute, by parentage[edit]

Under certain circumstances, children may acquire U.S. citizenship from their parents. The Naturalization Act of 1790 provided for birthright citizenship for children born out of U.S. jurisdiction to two citizen parents. The Naturalization Act of 1795, which increased the period of required residence from two to five years, introduced the Declaration of Intention requirement, or "first papers", which created a two-step naturalization process, and omitted the term "natural born". The Act specified that naturalized citizenship was reserved only for "free white person[s]" and changed the requirement in the 1790 Act of "good character" to read "good moral character". The Naturalization Act of 1798 increased the period necessary for immigrants to become naturalized citizens in the United States from 5 to 14 years.

In 1855, birthright citizenship was extended to children with citizen fathers and noncitizen mothers.[20] In 1934, it was extended to children with citizen mothers and noncitizen fathers.[21] From 1940 until 1978, a child born abroad who acquired U.S. citizenship at birth but had only one U.S. citizen parent had to fulfill a "retention requirement" of residing, or being physically present, in the United States or its outlying possessions for a certain number of years before reaching a specified age. Otherwise the child would not retain the U.S. citizenship (hence the name "retention requirement"). The retention requirement was changed several times, eliminated in 1978, and subsequently eliminated with retroactive effect in 1994.[22]

Children born overseas to married parents[edit]

The following conditions affect children born outside the U.S. and its outlying possessions to married parents (special conditions affect children born out of wedlock: see below):[23]

•       If both parents are U.S. citizens, the child is a citizen if either of the parents has had residency in the U.S. prior to the child's birth

•       If one parent is a U.S. citizen and the other parent is a U.S. national, the child is a citizen, if the U.S. citizen parent has lived in the U.S. for a continuous period of at least one year prior to the child's birth

•       If one parent is a U.S. citizen and the other parent is not a U.S. citizen or national, the child is a citizen if the U.S. citizen parent has been "physically present" in the U.S. (including, in some circumstances, time spent overseas when a parent who is a U.S. government employee is posted overseas) before the child's birth for a total period of at least five years, and at least two of those five years were after the U.S. citizen parent's fourteenth birthday.[24]

Children born overseas to unmarried parents[edit]

There is an asymmetry in the way citizenship status of children born overseas to unmarried parents,

only one of whom is a U.S. citizen, is handled.

Title 8 U.S.C. § 1409 paragraph (c) provides that children born abroad after December 24, 1952, to unmarried American mothers are U.S. citizens, as long as the mother has lived in the U.S. for a continuous period of at least one year at any time prior to the birth.

8 U.S.C. § 1409 paragraph (a) provides that children born to American fathers unmarried to the children's non-American mothers are considered U.S. citizens only if the father meets the "physical presence" conditions described above, and the father takes several actions:

• Unless deceased, has agreed to provide financial support while the child is under the age of 18 years

• Establish paternity by clear and convincing evidence and, while the person is under the age of 18 years

o the person is legitimated under the law of the person's residence or domicile,

o the father acknowledges paternity of the person in writing under oath, or

o the paternity of the person is established by adjudication of a competent court.

☐ 8 U.S.C. § 1409 paragraph (a) provides that acknowledgment of paternity can be shown by acknowledging paternity under oath and in writing; having the issue adjudicated by a court; or having the child otherwise "legitimated" by law.

Because of this rule, unusual cases have arisen whereby children have been fathered by American men overseas from non-American women, brought back to the United States as babies without the mother, raised by the American father in the United States, and later held to be deportable as non-citizens in their 20s.[25][26] The final element has taken an especially significant importance in these circumstances, as once the child has reached 18, the father is forever unable to establish paternity to deem his child a citizen.[27]

This distinction between unwed American fathers and American mothers was constructed and reaffirmed by Congress out of concern that a flood of illegitimate Korean and Vietnamese children would later claim American citizenship as a result of their parentage by American servicemen overseas fighting wars in their countries.[28] In many cases, American servicemen passing through in wartime may not have even learned they had fathered a child.[28] In 1998, the Supreme Court upheld the discriminatory provisions of section 1409 in Miller v. Albright in a 6–3 decision which held that a woman's ties to a child are biological, but a father's ties to a child are a legally constructed choice.[29]:100–105 In 2001, the Supreme Court, by 5–4 majority in Nguyen v. INS, reaffirmed the constitutionality of this gender distinction.[30]:224 [25][26]

Eligibility for office of President[edit]

 Part of the constitutional provision as it appeared in 1787

Main article: Natural-born-citizen clause (United States)

According to the Constitution of the United States only natural born citizens (or citizens at the time of the adoption of the Constitution) are eligible to serve as President of the United States or as Vice President. The text of the Constitution does not define what is meant by natural born: in particular it does not specify whether there is any distinction to be made between persons whose citizenship is based on jus sanguinis (parentage) and those whose citizenship is based on jus soli (birthplace). As a result, controversies have arisen over the eligibility of a number of candidates for the office.

Legal history[edit]

Throughout the history of the United States, the fundamental legal principle governing citizenship has been that birth within the United States grants U.S. citizenship; although enslaved persons and children of enslaved mothers, under the principle of partus sequitur ventrem, were excluded,[31] as were married women until the middle of the 20th century.[32] The United States did not grant citizenship after the American Civil War to all former slaves until the passage of the Civil Rights Act of 1866, which was subsequently confirmed by the Fourteenth Amendment. American Indian tribal members are not covered specifically by the constitutional guarantee. Those living in tribes on reservations were generally not considered citizens until passage of the Indian Citizenship Act of 1924, although by that time nearly two-thirds of American Indians were already citizens.

English common law[edit]

Birthright citizenship, as with much United States law, has its roots in English common law.[33] Calvin's Case, 77 Eng. Rep. 377 (1608),[35] was particularly important as it established that, under

English common law, "a person's status was vested at birth, and based upon place of birth—a person born within the king's dominion owed allegiance to the sovereign, and in turn, was entitled to the king's protection."[36]

This same principle was well-established in the antebellum United States. Justice Joseph Story described the rule in Inglis v. Trustees of Sailor's Snug Harbor:

The rule commonly laid down in the books is, that every person who is born within the ligeance of a sovereign is a subject; and, e converso, that every person born without such allegiance is an alien. . . . Two things usually concur to create citizenship; first, birth locally within the dominions of the sovereign; and secondly, birth within the protection and obedience, or in other words, within the ligeance of the sovereign. That is, the party must be born within a place where the sovereign is at the time in full possession and exercise of his power, and the party must also at his birth derive protection from, and consequently owe obedience or allegiance to the sovereign, as such, de facto.[37]

Justice Story described as exceptions to the rule the children of ambassadors and the children of occupying enemy soldiers.[38]

As these exceptions were narrow, the rule was quite generous in scope. As one antebellum American treatise put it:

Therefore every person born within the United States, its territories or districts, whether the parents are citizens or aliens, is a natural born citizen in the sense of the Constitution, and entitled to all the rights and privileges appertaining to that capacity.[39]

In the 1844 New York case of Lynch v. Clarke, the court held that the common law rule applied in the United States, and ruled that a child born in United States of a temporary visitor to the country was a natural-born citizen of the United States under this rule.[40]

Chancellor James Kent, in his influential Commentaries on American Law, framed the rule in terms similar to what would become the citizenship clause of the Fourteenth Amendment: "Natives," he said, "are all persons born within the jurisdiction of the United States," while "[a]n alien," conversely, "is a person born out of the jurisdiction of the United States."[41]

The Supreme Court thus stated that the rule was "ancient and fundamental", i.e., well-established common law, in 1898: "the Fourteenth Amendment affirms the ancient and fundamental rule of citizenship by birth within the territory, in the allegiance and under the protection of the country, including all children here born of resident aliens, with the exceptions or qualifications (as old as the rule itself) of children of foreign sovereigns or their ministers, or born on foreign public ships, or of enemies within and during a hostile occupation of part of our territory, and with the single additional exception of children of members of the Indian tribes owing direct allegiance to their several tribes." United States v. Wong Kim Ark, 169 U.S. 649 (1898).

Federal law[edit]

The Naturalization Act of 1790 (1 Stat. 103) provided the first rules to be followed by the United States in the granting of national citizenship.[42] While the law did not specifically prevent women from having their own citizenship, the law recognized only the authority of a husband if a woman was married.[43] Under the rule of coverture, the control of the physical body of married woman, as well as rights to her person or property, were the possession of her husband. Her loyalty to her spouse was deemed more significant than any obligation she might have to the state.[44]:xxiii Judicial rulings on domestic relations held that infants, slaves, and women were unable to participate in public life, because they lacked sufficient judgement and could not control either their own will or property.[45][46] Since that time, laws concerning immigration and naturalization in the United States have undergone a number of revisions.[42]

Naturalization Act of 1804 and 1855[edit]

The Naturalization Act of 1804 specifically confirmed that married women's access to citizenship was tied to their state of marriage.[32] The law stated that widows and children of aliens who had complied with the declaration of intent to become a citizen specified in the Act of 1802, but died prior to being naturalized were entitled to the rights and privileges of citizenship, if they took the necessary oath.[47] Provisions of the Naturalization Act of 1855 specified that a woman married to a native-born citizen or a naturalized alien, or a child born on foreign soil, but to a citizen father, were citizens, as long as they were white.[32][48][49]

Dred Scott v. Sandford[edit]

Dred Scott

Justice Roger B. Taney in the majority opinion in Dred Scott v. Sandford 60 U.S. (How. 19) 393 (1857) held that African Americans, whether slave or free, had never been and could never become citizens of the United States, as they were excluded by the Constitution. The political scientist Stuart Streichler writes that Taney's decision was based on "a skewed reading of history".[50] Justice Benjamin R. Curtis in his dissent showed that under the Articles of Confederation, free blacks had already been considered citizens in five states and carried that citizenship forward when the Constitution was ratified.[51]

Justice Curtis wrote:

The first section of the second article of the Constitution uses the language "a natural-born citizen". It thus assumes that citizenship may be acquired by birth. Undoubtedly, this language of the Constitution was used in reference to that principle of public law, well understood in the history of this country at the time of the adoption of the Constitution, which referred Citizenship to the place of birth. At the Declaration of Independence, and ever since, the received general doctrine has been, in conformity with the common law, that free persons born within either of the colonies, were the subjects of the King; that by the Declaration of independence, and the consequent acquisition of sovereignty by the several States, all such persons ceased to be subjects, and became citizens of the several States ... The Constitution has left to the States the determination what person, born within their respective limits, shall acquire by birth citizenship of the United States ...[52]

Justice John McLean, in his dissent, said of Dred Scott himself: "Being born under our Constitution and laws, no naturalization is required, as one of foreign birth, to make him a citizen."[53]

1862 opinion of the Attorney General of the United States[edit]

In 1862, Secretary of the Treasury Salmon P. Chase sent a question to Attorney General Edward Bates asking whether or not "colored men" can be citizens of the United States. Attorney General Bates responded on November 29, 1862, with a 27-page opinion concluding, "I conclude that the free man of color, mentioned in your letter, if born in the United States, is a citizen of the United States, ..." [italics in original][54] In the course of that opinion, Bates commented at some length on the nature of citizenship, and wrote,

... our constitution, in speaking of natural born citizens, uses no affirmative language to make them such, but only recognizes and reaffirms the universal principle, common to all nations, and as old as political society, that the people born in a country do constitute the nation, and, as individuals, are natural members of the body politic. If this be a true principle, and I do not doubt it, it follows that every person born in a country is, at the moment of birth, prima facie a citizen; and who would deny it must take upon himself the burden of proving some great disfranchisement strong enough to override the natural born right as recognized by the Constitution in terms the most simple and comprehensive, and without any reference to race or color, or any other accidental circumstance.[55] [italics in original]

Civil Rights Act of 1866[edit]

The Civil Rights Act of 1866 declared: "... all persons born in the United States, and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States." ("Indians not taxed" referred to Native American tribal members living on reservations.)[56]

Representative James F. Wilson of Iowa, upon introducing the citizenship clause of the Act, stated that it was "merely declaratory of what the law now is," and recounted at length the common law history of birthright citizenship.[57] Representative John Bingham of Ohio affirmed that the clause was "simply declaratory of what is written in the Constitution," with specific reference to the "natural-born citizen" qualification for presidential office.[58]

Fourteenth Amendment to the United States Constitution[edit]

Since the adoption of the Fourteenth Amendment to the Constitution on July 9, 1868, citizenship of persons born in the United States has been controlled by its Citizenship Clause, which states: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."[10]

Expatriation Act of 1868[edit]

Main article: Expatriation Act of 1868

This act, a companion piece to the Fourteenth Amendment, was approved on July 27, 1868.[59] The law allowed Americans to voluntarily give up their citizenship. Though it did not provide specific

requirements to do that, subsequent court cases, such as that of Nellie Grant Sartoris, ruled that marriage to an alien was a voluntary expatriation. Further clarifications from rulings maintained that a married woman could lose her citizenship if she lived abroad with her alien spouse or if her marriage automatically bestowed upon her the nationality of her husband.[60][61]:89

The Expatriation Act of 1868 led President Ulysses S. Grant to write in 1873, that the United States had "led the way in the overthrow of the feudal doctrine of perpetual allegiance".[62]

Edward J. Erler of California State University, San Bernardino, and Brook Thomas of the University of California at Irvine, have argued that this Act was an explicit rejection of birth-right citizenship as the ground for American citizenship,[63] basing that argument on the debate that surrounded the passage of this act.[64][65] Professor Garrett Epps of the University of Baltimore disagrees: "The Expatriation Act is not, as Erler imagines, 'a necessary companion piece to the citizenship clause.' In fact, there is no relationship at all between the two. The act was written in a different year, by different authors, on a different subject, and in a different Congress, than the Fourteenth Amendment."[66] American courts had long recognized that the rule of perpetual allegiance "does not stand upon the same reason or principle as the common law doctrine of allegiance by birth, and does not follow from the adoption of the latter.",[67] concluding in 1844 that, "A diversity of opinion and of practice on the subject of perpetual allegiance prevailed in the colonies and in the states, under the old Confederation. [...] [I]n the national government, the common law rule of perpetual allegiance did not prevail; while the universal prevalence of the rule of allegiance by birth in all the colonies and states up to [1789], would be a convincing argument that such rule became the national law.[67]

1873 legal opinions on the 14th Amendment[edit]

In 1873, The Attorney General of the United States published the following legal opinion concerning the Fourteenth Amendment:

The word 'jurisdiction' must be understood to mean absolute and complete jurisdiction, such as the United States had over its citizens before the adoption of this amendment. Aliens, among whom are persons born here and naturalized abroad, dwelling or being in this country, are subject to the jurisdiction of the United States only to a limited extent. Political and military rights and duties do not pertain to them.[68]

The Attorney General clarified this remark as follows:

The child born of alien parents in the United States is held to be a citizen thereof, and to be subject to duties with regard to this country which do not attach to the father. The same principle on which such children are held by us to be citizens of the United States, and to be subject to duties to this country, applies to the children of American fathers born without the jurisdiction of the United States, and entitles the country within whose jurisdiction they are born to claim them as citizen and to subject them to duties to it. Such children are born to a double character: the citizenship of the father is that of the child so far as the laws of the country of which the father is a citizen are concerned, and within the jurisdiction of that country; but the child, from the circumstances of his birth, may acquire rights and owes another fealty besides that which attaches to the father.[69]

That same year, the trial of Susan B. Anthony resulted in a ruling by Associate Justice of the Supreme Court of the United States Ward Hunt, in the U.S. Circuit Court for the Northern District of New York. He held that neither the Fourteenth Amendment, which prohibited states from abridging the rights and privileges of citizens, nor the Fifteenth Amendment, which granted citizens the right to vote, applied to Anthony, because voting rights and conditions were defined by the state and not the national government. Since denying the vote on the basis of sex was not prohibited by the Fifteenth Amendment and sanctions for violating the second section of the Fourteenth Amendment only defined breaches to male citizens' rights, Hunt determined that a state could define unequal rights to different people.[70]

Expatriation Act of 1907[edit]

Main article: Expatriation Act of 1907

The Expatriation Act of 1907 codified that women married to aliens lost their citizenship upon marriage to a non-citizen. It did not matter if they resided in the United States or abroad[48] and was applied retroactively and without notice.[71]:319–320 It also prevented immigrant women from being able to obtain their own US nationality, if their spouse was not or could not be naturalized, because he was racially excluded, was an anarchist, or was a practitioner of polygamy.[32][72]:1461,1465 If her husband later was able to acquire US citizenship, a wife automatically gained his new nationality.[73]

Women did not have their own nationality papers, instead they were required to provide a copy of their marriage record and husband's proof of citizenship.[32]

Cable Act of 1922[edit]

Main article: Cable Act

As soon as women gained the right to vote, they began pressuring Congress to eliminate provisions which automatically reassigned women's citizenship upon their marriage.[72]:1464 In 1922, the Cable Act was passed which guaranteed women independent citizenship if their spouse was eligible for naturalization.[32] A wife's nationality was still dependent upon her husband's status and if he was ineligible, or if she lived abroad in her husband's country for two years, or in any foreign nation for five years, her nationality was forfeited.[73][72]:1464 Ineligibility applied to anyone who was neither white nor of African descent.[71]:325 The Act also allowed American-born women who had lost their citizenship by virtue of marriage a means to repatriate, if they returned to the United States. However, to re-enter the United States and apply under a petition for naturalization, required that her return did not exceed the restricted the number of immigrants from each country specified in the Emergency Quota Act of 1921.[73][72]:1466 The same requirement did not apply to foreign wives of American men. Wives and children of male citizens were exempt from restrictive quotas.[72]:1468

Asian Exclusion Act[edit]

Main article: Immigration Act of 1924

Under the terms of the Asian Exclusion Act, Asians were not only excluded from naturalizing, but were prohibited from entering the country.[74] It also provided that an American-born woman who lost her citizenship and was married or had been married to an immigrant who was ineligible for US citizenship was considered to have been "born in the country of which [they were] a citizen or subject".[72]:1466 In 1923, a Supreme Court ruling, United States v. Bhagat Singh Thind retroactively stripped citizenship from Asian men, and combined with the provisions of the Cable Act, automatically deprived their wives of American citizenship as well.[72]:1467 Even if she remained in the United States, an American woman's citizenship was automatically revoked if she married a man of Asian descent. If she left the country, she could not be readmitted to the United States.[72]:1466 Under terms of the law, American men could petition for their foreign-born wives to lawfully immigrate, but American women were barred from petitioning on behalf of their husbands.[75]:422

Indian Citizenship Act of 1924[edit]

Main article: Indian Citizenship Act of 1924

The Indian Citizenship Act of 1924[76] provided "That all noncitizen Indians born within the territorial limits of the United States be, and they are hereby, declared to be citizens of the United States". This same provision (slightly reworded) is contained in present-day law as section 301(b) of the Immigration and Nationality Act of 1965 (8 U.S.C. § 1401).

The Equal Nationality Act of 1934[edit]

The Equal Nationality Act of 1934 allowed a married woman with children who had been born abroad to transmit her citizenship to her children, provided the mother had resided in the United States before the child was born.[44]:43 [77]:420 The law was not retroactive, thus children born before 1934 had difficulty in proving claims to derivative citizenship from their mother. The maternal derivative citizenship for children born abroad before 1934 was not confirmed until 1989.[44]:43 Previously only fathers were able to transmit derivative citizenship to their offspring. The law had no provisions for derivative nationality if the child(ren) were illegitimate.[77]:420

Nationality Acts of 1936 and 1940[edit]

Main article: Nationality Act of 1940

The Nationality Act of 1936 reaffirmed that a woman who had lost her citizenship through marriage to an alien before September 22, 1922, could regain her citizenship if the marriage had terminated, as long as she took the oath of citizenship.[32][73] It did not repeal the Cable Act, but the Nationality Act of 1940 repealed sections 1, 2, 3, and 4, as well as amendments from 1930, 1931, and 1934 of the Cable Act.[78]:1173 The 1940 law allowed all women who lost their citizenship because of marriage to repatriate without regard to their marital status upon swearing the oath of allegiance.[73] It also specified that derivative citizenship for children born out of wedlock could pass from mother to child, but required that a father legitimize the child declaring paternity before it reached majority.[77]:420

McCarran–Walter Act of 1952[edit]

Main article: Immigration and Nationality Act of 1952

The McCarran–Walter Act of 1952 recognized that previous nationality laws had discriminated against married women and sought to remove inequalities by replacing gendered identifiers with the term "spouse".[75]:424–425 It provided that children born outside of the United States had derivative citizenship if at least one of its unmarried parents was a citizen of the United States and had resided in the country for one year prior to the child's birth. If the parents were married, the citizen parent had to have lived five years in the United States after attaining age 14 and cumulatively have resided for ten years in the United States. Exception was made for active duty military personnel's service to be considered residence in the United States.[79][80]:235–236 The residency requirement in the United States meant that if a citizen parent, who was not in the military, was under the age of 19 when the child was born abroad, their child could not derive citizenship from the citizen parent. Though amended in 1978 and 1984, the discrimination based upon marital status and age remained unchanged until 1986. At that time, the law was amended to shorten the parent's residency time in the United States to five years, with at least 2 of those years being after the 14th birthday of the parent.[79]

U.S. Supreme Court case law[edit]

Sailor's Snug Harbor[edit]

In the case of Inglis v. Trustees of Sailor's Snug Harbor, 28 U.S. 99 (1830)[a] the Supreme Court decided the question of the disposition of the estate of a man born in New York State in 1776. The Supreme Court resolved complicated questions of how citizenship had been derived during the Revolutionary War. The court found that the jus soli is so consistent in American Law as to automatically grant American citizenship to children born in New York City between the Declaration of Independence and the Landing at Kip's Bay in 1776, but not to children born in New York during the British occupation that followed.

Nothing is better settled at the common law than the doctrine that the children even of aliens born in a country while the parents are resident there under the protection of the government and owing a temporary allegiance thereto are subjects by birth.

The Slaughter-House Cases[edit]

In the Slaughter-House Cases, 83 U.S. (16 Wall.) 36 (1873)[b]—a civil rights case not dealing specifically with birthright citizenship—a majority of the Supreme Court mentioned in passing that "the phrase 'subject to its jurisdiction' was intended to exclude from its operation children of ministers, consuls, and citizens or subjects of foreign States born within the United States".

Elk v. Wilkins[edit]

In Elk v. Wilkins, 112 U.S. 94 (1884),[c] the Supreme Court denied the birthright citizenship claim of an "Ameerican Indian" (referring there to Native Americans). The court ruled that being born in the territory of the United States is not sufficient for citizenship; those who wish to claim citizenship by birth must be born subject to the jurisdiction of the United States. The court's majority held that the children of Native Americans were

no more "born in the United States and subject to the jurisdiction thereof," within the meaning of the first section of the Fourteenth Amendment, than the children of subjects of any foreign government born within the domain of that government, or the children born within the United States of ambassadors or other public ministers of foreign nations.

Thus, Native Americans who voluntarily quit their tribes would not automatically become U.S. citizens.[81] Native Americans were granted U.S. citizenship by Congress half a century later in the Indian Citizenship Act of 1924, which rendered the Elk decision obsolete.

United States v. Wong Kim Ark[edit]

Wong Kim Ark, in a photograph taken from a 1904 U.S. immigration document

In the case of United States v. Wong Kim Ark, 169 U.S. 649 (1898),[d] the Supreme Court was presented with the following question:

[Whether a] child born in the United States, of parents of Chinese descent, who, at the time of his birth, are subjects of the Emperor of China, but have a permanent domicil and residence in the United States, and are there carrying on business, and are not employed in any diplomatic or official capacity under the Emperor of China, becomes at the time of his birth a citizen of the United States, by virtue of the first clause of the Fourteenth Amendment of the Constitution, "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State

wherein they reside."

The decision centered upon the 14th Amendment's reference to "jurisdiction", and concluded:
the Fourteenth Amendment affirms the ancient and fundamental rule of citizenship by birth within the territory, in the allegiance and under the protection of the country, including all children here born of resident aliens, with the exceptions or qualifications (as old as the rule itself) of children of foreign sovereigns or their ministers, or born on foreign public ships, or of enemies within and during a hostile occupation of part of our territory, and with the single additional exception of children of members of the Indian tribes owing direct allegiance to their several tribes. The Amendment, in clear words and in manifest intent, includes the children born, within the territory of the United States, of all other persons, of whatever race or color, domiciled within the United States. Every citizen or subject of another country, while domiciled here, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States. His allegiance to the United States is direct and immediate, and, although but local and temporary, continuing only so long as he remains within our territory, is yet, in the words of Lord Coke in Calvin's Case, 7 Rep. 6a, "strong enough to make a natural subject, for if he hath issue here, that issue is a natural-born subject;" and his child, as said by Mr. Binney in his essay before quoted, "if born in the country, is as much a citizen as the natural-born child of a citizen, and by operation of the same principle."

Mackenzie v. Hare[edit]

Ethel Mackenzie was an American-born woman who married a British subject in 1909. When she attempted to register to vote in 1911 in California, Mackenzie was refused because she was not a citizen.[44]:41 She was advised that if her husband became a US citizen, she could register, but Mackenzie believed that her citizenship was a birthright and refused to have her husband naturalize.[44]:42[82] Mackenzie filed a suit in the California federal courts against the San Francisco Election Commissioners. She alleged she had not lost her nationality under the Expatriation Act of 1907 by virtue of the birthright citizenship provisions of the Fourteenth Amendment to the United States Constitution. Her claim was denied and she escalated the case to the Supreme Court.[82] In Mackenzie v. Hare 239 U.S. 299, 311 (1915), the justices ruled that "Marriage of an American woman with a foreigner is tantamount to voluntary expatriation".[83]

Plyler v. Doe[edit]

Plyler v. Doe, 457 U.S. 202 (1982),[e] involved illegal alien children and their rights to public education. This case did not explicitly address the question of babies born in the United States to illegal immigrant parents; the children dealt with in the case were born outside the U.S. and had entered the country illegally along with their parents.

The court did suggest (in dicta) that illegal immigrants are "within the jurisdiction" of the states in which they reside, and that[84][85]

no plausible distinction with respect to Fourteenth Amendment 'jurisdiction' can be drawn between resident aliens whose entry into the United States was lawful, and resident aliens whose entry was unlawful.

In 2006 judge James Chiun-Yue Ho, who President Donald Trump would later appoint to the United States Court of Appeals for the Fifth Circuit, wrote in a law review article that with the Plyler decision "any doubt was put to rest" whether the 1898 Wong Kim Ark decision applied to illegal aliens given that "[in Plyler] all nine justices agreed that the Equal Protection Clause protects legal and illegal aliens alike. And all nine reached that conclusion precisely because illegal aliens are 'subject to the jurisdiction' of the U.S., no less than legal aliens and U.S. citizens."[86][87]

Canadians transferred to U.S. hospitals[edit]

Since the majority of Canadians live in the relatively thin strip of land close to the long border with the United States, Canadians in need of urgent medical care are occasionally transferred to nearby American medical centers. In some circumstances, Canadian mothers facing high-risk births have given birth in American hospitals. Such children are American citizens by birthright.[88]

In these circumstances, Canadian laws are similar to those of the United States. Babies born in Canada of American parents are also Canadian citizens by birthright.[89]

In both of these situations, the birthright citizenship is passed on to their children, born decades later. In some cases, births in American hospital (sometimes called "border babies") have resulted in persons who lived for much of their lives in Canada without knowing that they had never had official Canadian

citizenship. Some of these people have been called Lost Canadians.[90]

Another problem arises where a Canadian child, born to Canadian parents in a U.S. border hospital, is treated as a dual citizen and added to the United States tax base on this basis despite having never lived, worked nor studied in that nation. While Canadian income tax is payable only by those who reside or earn income in Canada, the U.S. Internal Revenue Service taxes its citizens worldwide. Campobello Island is particularly problematic as, while legally part of New Brunswick, the only year-round fixed link off the island leads not to Canada but to Lubec, Maine—leading to many Canadians whose families have lived on Campobello for generations not being able to claim to be born in Canada.[91]

Political controversies[edit]

Original meaning[edit]

U.S. Senator from Michigan Jacob M. Howard, author of the Citizenship Clause of the Fourteenth Amendment to the United States Constitution

During the original debate over the 14th Amendment Senator Jacob M. Howard of Michigan—the sponsor of the Amendment, though the Citizenship Clause was written by Senator Wade—described the clause as having the same content, despite different wording, as the earlier Civil Rights Act of 1866, namely, that it excludes American Indians who maintain their tribal ties and "persons born in the United States who are foreigners, aliens, who belong to the families of ambassadors or foreign ministers".[92] Others also agreed that the children of ambassadors and foreign ministers were to be excluded.[93][94] Concerning the children born in the United States to parents who are not U.S. citizens (and not foreign diplomats), three senators, including Senate Judiciary Committee Chairman Lyman Trumbull, the author of the Civil Rights Act, as well as President Andrew Johnson, agreed, asserting that both the Civil Rights Act and the 14th Amendment would confer citizenship on them at birth, and no senator offered a contrary opinion.[95][96][97]

Most of the debate on this section of the Amendment centered on whether the wording in the Civil Rights Act or Howard's proposal more effectively excluded Aboriginal Americans on reservations and in U.S. territories from citizenship. Senator James R. Doolittle of Wisconsin asserted that all Native Americans are subject to the jurisdiction of the United States, so that the phrase "Indians not taxed" would be preferable,[98] but Trumbull and Howard disputed this, arguing that the U.S. government did not have full jurisdiction over Native American tribes, which govern themselves and make treaties with the United States.[99][100]

In 1912 in his Treatise on the Laws Governing the Exclusion and Expulsion of Aliens in the United States, Clement Lincoln Bouvé argued that based on the 14th Amendment, Wong Kim Ark, and other case law, "...the child born of alien parents who, though under the immigration law they have no right to do so and are subject at any time to deportation thereunder, are nevertheless residing in the United States and owe temporary allegiance thereto, is necessarily born in allegiance to, and, therefore, is a citizen of this country."[101]

Edward Erler in 2007 argued that since the Wong Kim Ark case dealt with someone whose parents were in the United States legally, there is no valid basis under the 14th Amendment for the practice of granting citizenship to U.S.-born children of illegal immigrants: "Even if the logic is that Wong Kim Ark became a citizen by birth with the permission of the United States when it admitted his parents to the country, no such permission has been given to those who enter illegally."[102] Akhil Amar responded to Erler, "I'm not sure that his Pandora's box can be limited to children of illegal aliens. It is a thin edge of a very big and dangerous wedge that I think runs squarely into Wong Kim Ark."[103] Similarly, Angelo Ancheta criticized the "consent-based theory of citizenship", saying that "The Fourteenth Amendment was designed to ensure citizenship for 'all persons' born in the United States, particularly in response to ambiguities in legal status that attached to being the descendants of an outsider class, namely slaves."[104]

Opposition to birthright citizenship[edit]

In the late 1990s opposition arose over the longstanding practice of granting automatic citizenship on a jus soli basis.[105] Fears grew in some circles that the existing law encouraged parents-to-be to come to the United States to have children (sometimes called birth tourism) in order to improve the parents' chances of attaining legal residency themselves.[106][107] Some media correspondents[108][109] and public leaders, including former congressman Virgil Goode, have controversially dubbed this the "anchor baby" situation,[110][111] and politicians have proposed legislation on this basis that might

alter how birthright citizenship is awarded.[112]

A Pew Hispanic Center analysis of Census Bureau data determined that about 8 percent of children born in the United States in 2008—about 340,000—were offspring of "unauthorized immigrants". In total, about four million American-born children of unauthorized immigrant parents resided in this country in 2009, along with about 1.1 million foreign-born children of unauthorized immigrant parents.[113]

The Center for Immigration Studies asserted in 2010 that between 300,000 and 400,000 children were then being born each year to illegal immigrants in the U.S.[114][115][dead link]

Bills have been introduced from time to time in Congress which have sought to declare American-born children of foreign nationals not to be "subject to the jurisdiction of the United States", and thus not entitled to citizenship via the 14th Amendment, unless at least one parent was an American citizen or a lawful permanent resident.

In 1993, Sen. Harry Reid (D-Nev.) introduced legislation that would limit birthright citizenship to the children of U.S. citizens and legally resident aliens, and similar bills have been introduced by other legislators in every Congress since.[114] For example, U.S. Representative Nathan Deal, a Republican from the State of Georgia, introduced the "Citizenship Reform Act of 2005" (H.R. 698) in the 109th Congress,[116] the "Birthright Citizenship Act of 2007" (H.R. 1940)[117] in the 110th Congress, and the "Birthright Citizenship Act of 2009" (H.R. 1868)[118] in the 111th Congress. However, neither these nor any similar bill has ever been passed by Congress.

Some legislators, unsure whether such Acts of Congress would survive court challenges, have proposed that the Citizenship Clause be changed through a constitutional amendment.[119] Senate Joint Resolution 6, introduced on January 16, 2009 in the 111th Congress, proposes such an amendment;[120] however, neither this, nor any other proposed amendment, has yet been approved by Congress for ratification by the states.

President Donald Trump said on October 30, 2018, that he intends to remove, by means of an executive order, the right of citizenship from people born in the U.S. to foreign nationals.[121][122] In August 2019, USA Today reported that the new policy will make U.S. service members and government employees whose child is not automatically a United States citizen go through a different process to apply for their child's citizenship and that, according to estimates by the United States Citizenship and Immigration Services (USCIS), this will impact approximately 20 to 25 people annually.[123] No such executive order had materialized by the time President Trump left office in 2021.

Demographics[edit]

Many farmworkers do not have citizenship, but do have children who qualify by jus soli.[124]

See also[edit]

- Birth tourism
- Birther
- United States nationality law

References[edit]

1.  ^ 8 U.S.C. § 1101(a)(23) ("The term 'naturalization' means the conferring of nationality of a state upon a person after birth, by any means whatsoever.") (emphasis added).

2.  ^ Smith, Rogers M. (2009). "Birthright Citizenship and the Fourteenth Amendment in 1868 and 2008". University of Pennsylvania Journal of Constitutional Law. 11 (5): 1329–1336.

3.  ^ 8 U.S.C. § 1401 ("Nationals and citizens of United States at birth").

4.  ^ See 8 U.S.C. § 1101(a)(36) (defining "State") and 8 U.S.C. § 1101(a)(38) (defining "United States").

5.  ^ Weiner 1998, p. 238.

6.  ^ Max Ehrenfreund (August 17, 2015). "Understanding Trump's plan to end citizenship for undocumented immigrants' kids". Washington Post.

7.  ^ Jump up to:a b Wall Street Journal: "Birthright Citizenship, by the Numbers" August 20, 2015

8.  ^ "Number of babies born to unauthorized immigrants in U.S. continues to decline". Pew Research Center. Retrieved October 30, 2018.

9.  ^ US issues new rules restricting travel by pregnant foreigners, fearing the use of 'birth tourism'.

10.      ^ Jump up to:a b Meese 2005, p. 35

11.      ^ "U.S. Department of State Foreign Affairs Manual Volume 7 – Consular Affairs 1120 ACQUISITION OF U.S. NATIONALITY IN U.S. TERRITORIES AND POSSESSIONS". U.S. Department of State. Archived from the original (PDF) on December 22, 2015. Retrieved December 13, 2015. 7 FAM 1121.2-1 Definition of Terms

12.      ^ "INA: Act 302 – Persons Born in Puerto Rico". U.S. Citizenship and Immigration Services. Retrieved October 19, 2012.

13.      ^ Tuaua v. United States, 788 F.3d 300, 301-02 (D.C. Cir. 2015) ("The judgment of the district court is affirmed; the Citizenship Clause does not extend birthright citizenship to those born in American Samoa.").

14.      ^ Fitisemanu v. United States, No. 20-4017, (10th Cir. 2021) ("Such consideration properly falls under the purview of Congress, a point on which we fully agree with the concurrence. These circumstances advise against the extension of birthright citizenship to American Samoa. We reverse.").

15.      ^ Pampuro, Amanda (June 16, 2021). "American Samoans Are Not Born Into US Citizenship". Courthouse News Service. Retrieved September 13, 2021.

16.      ^ 8 FAM 302.1 Historical Background to Acquisition by Birth in U.S. Territories and Possessions

17.      ^ "8 Fam 301.1 (U) Acquisition by Birth in the United States". US Department of State. June 27, 2018.

18.      ^ "8 Fam 301.1 (U) Acquisition by Birth in the United States". US Department of State. June 27, 2018.

19.      ^ "8 Fam 301.1 (U) Acquisition by Birth in the United States". US Department of State. June 27, 2018.

20.      ^ 10 Stat. 604

21.      ^ 48 Stat. 797

22.      ^ Henry J. Chang: U.S. Citizenship Acquired by Birth Abroad

23.      ^ 8 U.S.C. § 1401

24.      ^ Immigration and Nationality Act § 301(g); 8 USC § 1401(g). For children born prior to the enactment of Public Law 99-653 on November 14, 1986, the citizen parent's U.S. presence requirement is ten years, of which at least five years had to have been after the parent's fourteenth birthday.

25.      ^ Jump up to:a b Findlaw.com: Nguyen v. INS, 533 U.S. 53 (2001)

26.      ^ Jump up to:a b Nguyen v. INS, 533 U.S. 53 (2001) Cornell University Law School.

27.      ^ Under a fact situation similar to Nguyen, the effect might be different today if the child's 18th birthday were after February 27, 2001, as per the Child Citizenship Act of 2000, the child might automatically become a U.S. citizen upon admission to the country as a lawful permanent resident. This type of citizenship, however, is not considered "birthright" or natural, and the subject would most likely be construed as a "naturalized" citizen. See the U.S. Department of State's page on the Child Citizenship Act of 2000 Archived January 22, 2010, at the Wayback Machine.

28.      ^ Jump up to:a b US v. Ahumada-Aguilar, 189 F.3d 1121 (9th Cir. 1999)

29.      ^ Augustine-Adams, Kif (Fall 2001). "Gendered States: A Comparative Construction of Citizenship and Nation". Virginia Journal of International Law. Charlottesville, Virginia: John Bassett Moore Society of International Law. 41 (1): 93–139. ISSN 0042-6571. OCLC 93293362. Retrieved March 4, 2021 – via HeinOnline.

30.      ^ Weinrib, Laura (January 2003). "Protecting Sex: Sexual Disincentives and Sex-Based Discrimination in Nguyen v. INS". Columbia Journal of Gender and Law. New York, New York: Columbia University School of Law. 12 (1): 222–273. doi:10.7916/cjgl.v12i1.2449. ISSN 1062-6220. Retrieved March 4, 2021.

31.      ^ Walter Dellinger, Assistant Attorney General (December 13, 1995), "Legislation denying citizenship at birth to certain children born in the United States", Memoranda and Opinions, Office of Legal Counsel, U.S. Department of Justice, archived from the original on July 25, 2009, retrieved January 4, 2007, A bill that would deny citizenship to children born in the United States to certain classes of alien parents is unconstitutional on its face. A constitutional amendment to restrict birthright citizenship, although not technically unlawful, would flatly contradict the Nation's constitutional history and constitutional traditions..

32.     ^ Jump up to:a b c d e f g Smith, Marian L. (Summer 1998). "'Any woman who is now or may hereafter be married . . .': Women and Naturalization, ca. 1802–1940". Prologue Magazine. Washington, D.C.: U.S. National Archives and Records Administration. 30 (2): 146–153, part 1, part 2. ISSN 0033-1031. OCLC 208742006.

33.     ^ Schuck 2006, p. 96

34.     ^ Price, Polly J. (1997). "Natural Law and Birthright Citizenship in Calvin's Case (1608)". Yale Journal of Law and the Humanities. 9.

35.     ^ Robert Calvin was born in Scotland around 1606. He inherited estates in England, but his rights thereto were challenged on the grounds that, as a Scot, he could not legally own English land.[34]

36.     ^ Justice, Elaine (October 7, 1996), "Price questions whether birthright citizenship will continue", Emory Report, retrieved January 4, 2007.

37.     ^ Inglis v. Trustees of Sailor's Snug Harbor 28 U.S. 99, 155 (1830).

38.     ^ See Inglis, 28 U.S. at 155.

39.     ^ William Rawle, A View of the Constitution of the United States of America, 2d Edition, 1829, Ch. IX.

40.     ^ Lynch v. Clarke 3 N.Y.Leg.Obs. 236 (1844)

41.     ^ 2 J. Kent, Commentaries on American Law, 33, 43 (1827)

42.     ^ Jump up to:a b The American Law Register. D.B. Canfield & Co. 1864. p. 599.

43.     ^ Bingham, Peregrine (1824). The Law of Infancy and Coverture (1st American from the Last London ed.). Exeter: George Lamson. pp. 181–182. OCLC 13516504.

44.     ^ Jump up to:a b c d e Kerber, Linda K. (1998). No Constitutional Right to Be Ladies: Women and the Obligations of Citizenship (1st ed.). New York, New York: Hill & Wang. ISBN 0-8090-7383-8.

45.     ^ Isenberg, Nancy (1998). Sex and Citizenship in Antebellum America. Chapel Hill, North Carolina: University of North Carolina Press. p. 45. ISBN 978-0-8078-4746-6.

46.     ^ Jefferson, Thomas (1999). Appleby, Joyce; Ball, Terence (eds.). Jefferson: Political Writings. Cambridge Texts in the History of Political Thought. Cambridge, UK: Cambridge University Press. pp. 219–220. ISBN 978-0-521-64841-7.

47.     ^ United States Congress (March 26, 1804). "United States Statutes-At-Large, Vol. 2: An Act in addition to an act entitled "An Act to establish an uniform rule of naturalization, and to repeal the acts heretofore passed on that subject" – 2 Stat. 292, 8th Congress, Sess. I, Chap. 47, March 26, 1804" (PDF). Asian American Digital History Archive. Washington, D. C.: Library of Congress. Retrieved December 10, 2020.

48.     ^ Jump up to:a b Taparata, Evan (July 4, 2016). "The US Has Come a Long Way Since Its First, Highly Restrictive Naturalization Law". The World. Minneapolis, Minnesota: Public Radio International. Archived from the original on October 28, 2020. Retrieved December 10, 2020.

49.     ^ United States Congress (February 10, 1855). "United States Statutes-At-Large: "An Act to secure the Right of Citizenship to Children of Citizens of the United States Born out of the Limits thereof" – 33rd Congress, Sess. II, Chap. 71, February 10, 1855" (PDF). Washington, D. C.: Library of Congress. Retrieved December 10, 2020.

50.     ^ Streichler 2005, p. 123

51.     ^ Streichler 2005, p. 126

52.     ^ Howard, Benjamin C. (1857). A Report of the Decision of the Supreme Court of the United States and the Opinions of the Judges Thereof, in the Case of Dred Scott Versus John F. A. Sandford. December Term, 1856. New York: D. Appleton & Company. pp. 576–582..

53.     ^ Dred Scott v. Sandford, 60 U.S. 393, 531, J. McLean, dissenting.

54.     ^ Bates, Edward (1862). Opinion of Attorney General Bates on Citizenship. Washington, D.C.: Government Printing Office. pp. 26–27. OCLC 252308921.

55.     ^ Bates, Edward (1862). Opinion of Attorney General Bates on Citizenship. Washington, D.C.: Government Printing Office. p. 12. OCLC 252308921.

56.     ^ "The 1866 Civil Rights Act". 14 Stat. 27–30. April 9, 1866. Retrieved January 7, 2016.

57.     ^ Cong. Globe, 39th Cong., 1st Sess., 1115–1117 (1866)

58.     ^ Cong. Globe, 39th Cong., 1st Sess., 1291 (1866)

59.      ^ Expatriation Act, 14th-amendment.com, quoting Sanger 1869, pp. 223–224.

60.      ^ United States Congress (1933). American Citizenship Rights of Women: Hearing Before a Subcommittee of the Committee on Immigration, United States Senate, Seventy-second Congress, Second Session, on S. 992, a Bill Relating to the Residence Requirements for Naturalization Purposes of Alien Wives of Members of the Diplomatic and Consular Service of the United States and Wives of Other Employees of the United States Government Stationed Abroad; S. 2760, a Bill Relative to the Admission Under the Immigration Laws of Wives of American Citizens; S. 3968, a Bill to Provide for the Citizenship of a Child Born of an American Mother and an Alien Father; and S. 4169, a Bill Relative to the Citizenship of Minor Children, and for Other Purposes. March 2, 1933. Washington, D. C.: U.S. Government Printing Office. pp. 18–19.

61.      ^ Cott, Nancy F. (2009). "Justice for All? Marriage and Deprivation of Citizenship in the United States". In Sarat, Austin; Kearns, Thomas R. (eds.). Justice and Injustice in Law and Legal Theory. Ann Arbor, Michigan: University of Michigan Press. pp. 77–98. ISBN 978-0-472-02368-4.

62.      ^ Snow (1893), Cases and Opinions on International Law, p. 218.

63.      ^ Transcript Archived March 10, 2009, at the Wayback Machine, Testimony of Edward J. Erler before the House Subcommittee on Immigration and Claims, June 25, 1997.

64.      ^ Erler 2003, pp. 191–192, Erler, West & Marini 2007, pp. 50–51

65.      ^ Thomas 2007, pp. 193–194.

66.      ^ "Birthright Citizenship and the Fourteenth Amendment". www.publicsquare.net. April 19, 2011.

67.      ^ Jump up to:a b "Lynch v. Clarke, 1 Sand. Ch. 583 (1844)". New York Court of Chancery. November 5, 1844 – via Harvard Law School Caselaw Access Project.

68.      ^ 14 U.S. Attorney General Opinions 300.

69.      ^ Opinions of the Executive Departments on Expatriation, Naturalization and Allegiance (1873) 17, 18; U.S. Foreign Relations, 1873–74, pp. 1191, 1192.

70.      ^ Gordon, Ann D. (2005). "The Trial of Susan B. Anthony" (PDF). Federal Judicial Center. Washington, D.C.: Federal Judicial History Offi ce. pp. 15–16. Archived (PDF) from the original on November 21, 2020. Retrieved December 10, 2020.

71.      ^ Jump up to:a b Batlan, Felice (July 2020). "'She Was Surprised and Furious': Expatriation, Suffrage, Immigration, and the Fragility of Women's Citizenship,1907-1940" (PDF). Stanford Journal of Civil Rights & Civil Liberties. Palo Alto, California: Stanford Law School. XV (Special Issue): 315–349. ISSN 1553-7951. Archived from the original (PDF) on July 15, 2020. Retrieved December 11, 2020.

72.      ^ Jump up to:a b c d e f g h Cott, Nancy F. (December 1998). "Marriage and Women's Citizenship in the United States, 1830-1934". The American Historical Review. New York, New York: Oxford University Press for the American Historical Association. 103 (5): 1440–1474. doi:10.2307/2649963. ISSN 0002-8762. JSTOR 2649963. Retrieved December 10, 2020.

73.      ^ Jump up to:a b c d e Hacker, Meg (Spring 2014). "When Saying "I Do" Meant Giving Up Your U.S. Citizenship" (PDF). Prologue. Washington, D. C.: National Archives and Records Administration: 56–61. ISSN 0033-1031. Retrieved November 22, 2020.

74.      ^ Office of the Historian (2020). "The Immigration Act of 1924 (The Johnson-Reed Act)". Foreign Service Institute. Washington, D. C.: United States Department of State. Archived from the original on November 16, 2019. Retrieved December 17, 2020.

75.      ^ Jump up to:a b Olivares, Mariela (February 2015). "Unreformed: Towards Gender Equality in Immigration Law" (PDF). Chapman Law Review. Orange, California: Chapman University School of Law. 18 (2): 419–450. ISSN 2381-3245. Archived from the original (PDF) on August 14, 2020. Retrieved December 17, 2020.

76.      ^ 43 United States Statutes at Large 253.

77.      ^ Jump up to:a b c Volpp, Leti (2005). "Divesting Citizenship: On Asian American History and the Loss of Citizenship through Marriage" (PDF). UCLA Law Review. Los Angeles, California: UCLA School of Law. 53 (2): 405–483. ISSN 0041-5650. OCLC 193654281.

78.      ^ 76th Congress (October 14, 1940). "An Act to Revise and Codify the Nationality Laws of the United States into a Comprehensive Nationality Code" (PDF). University of Washington Bothell. Washington, D. C.: US Congress. pp. 1137–1174. Archived from the original (PDF) on March 31,

2016. Retrieved December 16, 2020. Repeal...Sections 1, 2, 3, and 4, Act of September 22, 1922 (42 Stat. 1021–1022; as amended by sections 1 and 2, Act of July 3, 1930 (46 Stat. 854); section 4, Act of March 3, 1931 (46 Stat. 1511–1512); and section 4, Act of May 24, 1934 (48 Stat. 797; U.S.C., title 8, secs. 367, 368, 368a, 369, and 369a)

79.    ^ Jump up to:a b Arn, Cynthia C. (2018). "Acquiring U.S. Citizenship". landisarn.com. Portland, Maine: Landis, Arn & Jaynes P. A. Archived from the original on September 24, 2020. Retrieved December 17, 2020.

80.    ^ "Public Law 414" (PDF). govinfo.gov. Washington, D. C.: U. S. Congress. June 27, 1952. pp. 163–282. Archived (PDF) from the original on November 25, 2020. Retrieved December 17, 2020.

81.    ^ Urofsky, Melvin I.; Finkelman, Paul (2002). A March of Liberty: A Constitutional History of the United States. Vol. 1 (2nd ed.). New York, NY: Oxford University Press. ISBN 978-0-19-512635-8.

82.    ^ Jump up to:a b Shanahan, Brendan (December 2020). "Biographical Sketch of Ethel Mackenzie". In Dublin, Thomas; Sklar, Kathryn Kish (eds.). Biographical Database of NAWSA Suffragists, 1890-1920. Alexandria, Virginia: Alexander Street Press. – via ASP: Women and Social Movements (subscription required)

83.    ^ "Mackenzie v. Hare, 239 U.S. 299 (1915)". Justia. Washington, D. C.: U.S. Supreme Court. December 6, 1915. Archived from the original on November 11, 2020. Retrieved December 17, 2020.

84.    ^ Farley, Robert (November 13, 2015). "Trump Challenges Birthright Citizenship". FactCheck.org. The Annenberg Public Policy Center. Retrieved November 1, 2018.

85.    ^ Barnes, Robert (October 30, 2018). "Trump again raises much-debated but rarely tested question of birthright citizenship". The Washington Post. Retrieved August 18, 2020.

86.    ^ Ho, James Chiun-Yue (2006). "Defining "American": Birthright Citizenship and the Original Understanding of the 14th Amendment" (PDF). The Green Bag. 9 (4): 376. ISSN 1095-5216. Archived from the original (PDF) on December 22, 2017. Retrieved March 27, 2012.

87.    ^ Paul, Deanna (October 30, 2018). "Trump wants to end birthright citizenship. A judge he appointed says he can't". Washington Post. Archived from the original on November 16, 2018. Retrieved December 20, 2018.

88.    ^ "Some Canadian mothers forced to give birth in U.S." KOMO TV News. October 3, 2007. Retrieved July 22, 2016.

89.    ^ Citizenship Act PART I: THE RIGHT TO CITIZENSHIP, Federation of Law Societies of Canada, retrieved February 10, 2009

90.    ^ Citizenship and Immigration Canada True or False? Children born outside of Canada, Department of Citizenship and Immigration Canada, archived from the original on March 2, 2009, retrieved October 26, 2010

91.    ^ "Challenges for Campobello Island: A crossing to bear". July 2012.

92.    ^ Congressional Globe, 1st Session, 39th Congress, pt. 4, p. 2893 Senator Reverdy Johnson said in the debate: "Now, all this amendment provides is, that all persons born in the United States and not subject to some foreign Power—for that, no doubt, is the meaning of the committee who have brought the matter before us—shall be considered as citizens of the United States ... If there are to be citizens of the United States entitled everywhere to the character of citizens of the United States, there should be some certain definition of what citizenship is, what has created the character of citizen as between himself and the United States, and the amendment says citizenship may depend upon birth, and I know of no better way to give rise to citizenship than the fact of birth within the territory of the United States, born of parents who at the time were subject to the authority of the United States."

93.    ^ Congressional Globe, 1st Session, 39th Congress, pt. 4, p. 2897.

94.    ^ Congressional Globe, 1st Session, 39th Congress, pt. 1, p. 572.

95.    ^ Congressional Globe, 1st Session, 39th Congress, pt. 1, p. 498. The debate on the Civil Rights Act contained the following exchange:

Mr. Cowan: "I will ask whether it will not have the effect of naturalizing the children of Chinese and Gypsies born in this country?"

Mr. Trumbull: "Undoubtedly."

...

Mr. Trumbull: "I understand that under the naturalization laws the children who are born here of

parents who have not been naturalized are citizens. This is the law, as I understand it, at the present time. Is not the child born in this country of German parents a citizen? I am afraid we have got very few citizens in some of the counties of good old Pennsylvania if the children born of German parents are not citizens."

Mr. Cowan: "The honorable Senator assumes that which is not the fact. The children of German parents are citizens; but Germans are not Chinese; Germans are not Australians, nor Hottentots, nor anything of the kind. That is the fallacy of his argument."

Mr. Trumbull: "If the Senator from Pennsylvania will show me in the law any distinction made between the children of German parents and the children of Asiatic parents, I may be able to appreciate the point which he makes; but the law makes no such distinction; and the child of an Asiatic is just as much of a citizen as the child of a European."

96.    ^ Congressional Globe, 1st Session, 39th Congress, pt. 4, pp. 2891–2. During the debate on the Amendment, Senator John Conness of California declared, "The proposition before us, I will say, Mr. President, relates simply in that respect to the children begotten of Chinese parents in California, and it is proposed to declare that they shall be citizens. We have declared that by law [the Civil Rights Act]; now it is proposed to incorporate that same provision in the fundamental instrument of the nation. I am in favor of doing so. I voted for the proposition to declare that the children of all parentage, whatever, born in California, should be regarded and treated as citizens of the United States, entitled to equal Civil Rights with other citizens."

97.    ^ See veto message Archived December 26, 2010, at the Wayback Machine by President Andrew Johnson.

98.    ^ Congressional Globe, 1st Session, 39th Congress, pt. 4, pp. 2890, 2892–4, 2896.

99.    ^ Congressional Globe, 1st Session, 39th Congress, pt. 4, p. 2893. Senate Judiciary Committee Chairman Lyman Trumbull, participating in the debate, stated the following: "What do we [the committee reporting the clause] mean by 'subject to the jurisdiction of the United States'? Not owing allegiance to anybody else. That is what it means." He then proceeded to expound upon what he meant by "complete jurisdiction": "Can you sue a Navajoe Indian in court? ... We make treaties with them, and therefore they are not subject to our jurisdiction ... If we want to control the Navajoes, or any other Indians of which the Senator from Wisconsin has spoken, how do we do it? Do we pass a law to control them? Are they subject to our jurisdiction in that sense? ... Would he [Sen. Doolittle] think of punishing them for instituting among themselves their own tribal regulations? Does the Government of the United States pretend to take jurisdiction of murders and robberies and other crimes committed by one Indian upon another? ... It is only those persons who come completely within our jurisdiction, who are subject to our laws, that we think of making citizens."

100.    ^ Congressional Globe, 1st Session, 39th Congress, pt. 4, p. 2895. Howard additionally stated the word jurisdiction meant "the same jurisdiction in extent and quality as applies to every citizen of the United States now" and that the United States possessed a "full and complete jurisdiction" over the person described in the amendment.

101.    ^ Bouvé, Clement Lincoln (1912). "Of Aliens Unlawfully Residing In The United States". A Treatise on the Laws Governing the Exclusion and Expulsion of Aliens in the United States. Washington, D.C.: J. Byrne & co. p. 425. hdl:2027/uiuo.ark:/13960/t15n1mt6n.

102.    ^ Erler et al., The Founders on Citizenship and Immigration: Principles and Challenges in America, p. 67.

103.    ^ Rosen, Jeffrey, host. "Does the Constitution Require Birthright Citizenship?" We the People, National Constitution Center, November 8, 2018.

104.    ^ Angelo N. Ancheta, Race, Rights, and the Asian American Experience, p. 103.

105.    ^ Lee, Margaret (May 12, 2006), U.S. Citizenship of Persons Born in the United States to Alien Parents (PDF), Congressional Research Service Report for Congress, retrieved August 16, 2008 (brief record)

^ Lee, Margaret (September 13, 2005), U.S. Citizenship of Persons Born in the United States to Alien Parents (PDF), ilw.com, retrieved May 30, 2010 (full text)

106.    ^ "... During that debate, Senator Edgar Cowan of Pennsylvania objected to the citizenship clause of the 14th Amendment. 'Is the child of the Chinese immigrant in California a citizen?' he asked on the Senate floor. Senator John Conness of California said the answer should be 'yes.' 'The children

of all parentage whatever, born in California, should be regarded and treated as citizens of the United States, entitled to equal civil rights with other citizens,' Mr. Conness said." Robert Pear (August 7, 1996), "Citizenship Proposal Faces Obstacle in the Constitution", New York Times

107.      ^ "'Border baby' boom strains S. Texas", Houston Chronicle, September 24, 2006, retrieved August 2, 2008

108.      ^ Simmons, Kathryn. "Anchor babies tie illegal immigrants to U.S." NBC2 News. November 25, 2005.

109.      ^ Erbe, Bonnie. "Anchor Babies hurt working class." Seattle Times. May 18, 2005.

110.      ^ Goode-Perriello Exchange, Sorensen Institute Candidates' Forum, September 3, 2008, archived from the original on December 19, 2021, retrieved October 3, 2008

111.      ^ "Rep. Gayle Harrell says immigration is 'No. 1 issue'", Fort-Pierce Tribune, June 30, 2008, retrieved July 14, 2008

112.      ^ "GOP mulls ending birthright citizenship," Washington Times, November 3, 2005

113.      ^ "Unauthorized Immigrants and Their U.S.-Born Children," Pew Hispanic Center, August 11, 2010

114.      ^ Jump up to:a b Jon Feere, "Birthright Citizenship in the United States: A Global Comparison." Center for Immigration Studies.

115.      ^ Daniel González and Dan Nowicki. "Birthright citizenship change would have wide effects." Arizona Republic, March 20, 2011.

116.      ^ Citizenship Reform Act of 2005.

117.      ^ Birthright Citizenship Act of 2007 Archived September 18, 2008, at the Wayback Machine.

118.      ^ Birthright Citizenship Act of 2009.

119.      ^ U.S. Representative Anthony Beilenson (D-CA). "Case for Correction By Constitutional Amendment." The Social Contract. Volume 7, Number 1 (Fall 1996).

120.      ^ S. J. Res. 6, thomas.loc.gov, January 16, 2009, archived from the original on April 15, 2015, retrieved February 27, 2009

121.      ^ Da Silva, Chantal (October 30, 2018). "Trump Says He Plans to Sign Executive Order to Terminate Birthright Citizenship". CNN. Archived from the original on October 30, 2018. Includes video.

122.      ^ Schroeder, Robert (October 30, 2018). "Trump Today: President says he's preparing order to end birthright citizenship". Market Watch. Retrieved October 30, 2018.

123.      ^ "What we know about the new citizenship policy for some children of US military, government workers". USA Today. August 30, 2019.

124.      ^ Cohen Ibañez, Emily (2022). Fruits of Labor. POV. New York City, US: American Documentary, PBS, Wyncote Foundation, Reva & David Logan Foundation, Acton Family Giving, Park Foundation, NYC Cultural Affairs. EC - Director/Producer.

Sources[edit]

•      All Senate debate quotes are from the Congressional Globe (precursor of the Congressional Record) for the 39th Congress, 1st Session. pp. 2890–95.

•      Erler, Edward J. (2003), "From Subjects to citizens: The Social Origins of American Citizenship", in Pestritto, Ronald J. (ed.), The American Founding and the Social Compact (illustrated ed.), Lexington Books, ISBN 978-0-7391-0665-5.

•      Erler, Edward J.; West, Thomas G.; Marini, John A (2007), The Founders on Citizenship and Immigration: Principles and Challenges in America, Lanham, MD: Rowman & Littlefield, ISBN 978-0-7425-5855-7.

•      Mayton, William T. (2008). "Birthright Citizenship and the Civic Minimum". Georgetown Immigration Law Journal. 22 (221).

•      Sanger, George P., ed. (1869), Statutes at Large and Proclamations, of the United States of America. From December 1867 – March 1869, Boston: Little, Brown, and Company.

•      Schuck, Peter H. (2006), Diversity in America: Keeping Government at a Safe Distance, Harvard University Press, ISBN 978-0-674-01854-9.

•      Thomas, Brook (2007), Civic Myths: A Law-and-literature Approach to Citizenship (illustrated ed.), UNC Press, ISBN 978-0-8078-3153-3.

•      Weiner, Myron (1998), Migration and Refugees: in the United States and Germany,

Providence, RI: Berghahn Books, ISBN 978-1-57181-091-5.

Footnotes[edit]

1.    ^ Text of Inglis v. Trustees of Sailor's Snug Harbor, 28 U.S. 99 (1830) is available from: Cornell  Justia  OpenJurist

2.    ^ Text of Slaughter-House Cases, 83 U.S. (16 Wall.) 36 (1873) is available from: Cornell  Google Scholar  Justia  Library of Congress  OpenJurist

3.    ^ Text of Elk v. Wilkins, 112 U.S. 94 (1884) is available from: Cornell  CourtListener  Google Scholar  Justia  Library of Congress  OpenJurist

4.    ^ Text of United States v. Wong Kim Ark, 169 U.S. 649 (1898) is available from: Cornell  CourtListener  Google Scholar  Justia  Library of Congress  OpenJurist

5.    ^ Text of Plyler v. Doe, 457 U.S. 202 (1982) is available from: Cornell  Google Scholar  Justia  Library of Congress  Oyez (oral argument audio)

Further reading[edit]

•    Ancheta, Angelo N. (1998), Race, Rights, and the Asian American Experience, Brunswick, NJ: Rutgers University Press, ISBN 978-0-8135-2464-1.

•    Carlisle, Rodney P.; Golson, J. Geoffrey (2007), A House Divided During the Civil War Era (illustrated ed.), ABC-CLIO, ISBN 978-1-85109-881-1.

•    Ho, James C (March 10, 2007), "Can Congress Repeal Birthright Citizenship?", Los Angeles Times

•    Meese, Edwin III; David F. Forte; Matthew Spalding (2005), The Heritage Guide to the Constitution, Regnery Publishing, ISBN 978-1-59698-001-3.

•    Ridgell, Reilly (1995), Pacific Nations and Territories: The Islands of Micronesia, Melanesia, and Polynesia, Bess Press, ISBN 978-1-57306-001-1.

•    Streichler, Stuart (2005), Justice Curtis in the Civil War Era, ISBN 978-0-8139-2342-0.

Categories:

•    United States constitutional law
•    Immigration to the United States
•    Citizenship of the United States
•    Fourteenth Amendment to the United States Constitution


Interim Constitution (South Africa)

Judicial review is a process under which executive, legislative and administrative actions are subject to review by the judiciary.[1]:79 A court with authority for judicial review may invalidate laws, acts and governmental actions that are incompatible with a higher authority: an executive decision may be invalidated for being unlawful or a statute may be invalidated for violating the terms of a constitution. Judicial review is one of the checks and balances in the separation of powers: the power of the judiciary to supervise the legislative and executive branches when the latter exceed their authority. The doctrine varies between jurisdictions, so the procedure and scope of judicial review may differ between and within countries.

Judicial review can be understood in the context of two distinct—but parallel—legal systems, civil law and common law, and also by two distinct theories of democracy regarding the manner in which government should be organized with respect to the principles and doctrines of legislative supremacy and the separation of powers.

First, two distinct legal systems, civil law and common law, have different views about judicial review. Common-law judges are seen as sources of law, capable of creating new legal principles, and also capable of rejecting legal principles that are no longer valid. In the civil-law tradition, judges are seen as those who apply the law, with no power to create (or destroy) legal principles.

Secondly, the idea of separation of powers is another theory about how a democratic society's government should be organized. In contrast to legislative supremacy, the idea of separation of powers was first introduced by Montesquieu;[2] it was later institutionalized in the United States by the Supreme Court's ruling in Marbury v. Madison that the court had the power of judicial review to enforce the separation of powers stated in the US Constitution. This was left uncontested by the U.S. Congress and president Thomas Jefferson, despite his expressed opposition to the principle of judicial

review by an unelected body.

Separation of powers is based on the idea that no branch of government should be able to exert power over any other branch without due process of law; each branch of government should have a check on the powers of the other branches of government, thus creating a regulative balance among all branches of government. The key to this idea is checks and balances. In the United States, judicial review is considered a key check on the powers of the other two branches of government by the judiciary. Differences in organizing democratic societies led to different views regarding judicial review, with societies based on common law and those stressing a separation of powers being the most likely to utilize judicial review.[citation needed] Nevertheless, many countries whose legal systems are based on the idea of legislative supremacy have gradually adopted or expanded the scope of judicial review, including countries from both the civil law and common law traditions.

Another reason why judicial review should be understood in the context of both the development of two distinct legal systems (civil law and common law) and two theories of democracy (legislative supremacy and separation of powers) is that some countries with common-law systems do not have judicial review of primary legislation. Though a common-law system is present in the United Kingdom, the country still has a strong attachment to the idea of legislative supremacy; consequently, judges in the United Kingdom do not have the power to strike down primary legislation. However, when the United Kingdom became a member of the European Union there was tension between its tendency toward legislative supremacy and the EU's legal system, which specifically gives the Court of Justice of the European Union the power of judicial review.

Discrimination is the act of making unfair or prejudicial distinctions between people based on the groups, classes, or other categories to which they belong or are perceived to belong,[1] such as race, gender, age, religion, or sexual orientation.[2] Discrimination especially occurs when individuals or groups are unfairly treated in a way which is worse than other people are treated, on the basis of their actual or perceived membership in certain groups or social categories.[2][3] It involves restricting members of one group from opportunities or privileges that are available to members of another group.[4]

Discriminatory traditions, policies, ideas, practices and laws exist in many countries and institutions in all parts of the world, including territories where discrimination is generally looked down upon. In some places, attempts such as quotas have been used to benefit those who are believed to be current or past victims of discrimination. These attempts have often been met with controversy, and have sometimes been called reverse discrimination.

Etymology[edit]

The term discriminate appeared in the early 17th century in the English language. It is from the Latin discriminat- 'distinguished between', from the verb discriminare, from discrimen 'distinction', from the verb discernere (corresponding to to discern).[5] Since the American Civil War the term "discrimination" generally evolved in American English usage as an understanding of prejudicial treatment of an individual based solely on their race, later generalized as membership in a certain socially undesirable group or social category.[6] Before this sense of the word became almost universal, it was a synonym for discernment, tact and culture as in "taste and discrimination", generally a laudable attribute; to "discriminate against" being commonly disparaged.[7][8]

Definitions[edit]

Moral philosophers have defined discrimination using a moralized definition. Under this approach, discrimination is defined as acts, practices, or policies that wrongfully impose a relative disadvantage or deprivation on persons based on their membership in a salient social group.[9] This is a comparative definition. An individual need not be actually harmed in order to be discriminated against. He or she just needs to be treated worse than others for some arbitrary reason. If someone decides to donate to help orphan children, but decides to donate less, say, to black children out of a racist attitude, he or she will be acting in a discriminatory way even if he or she actually benefits the people he discriminates against by donating some money to them.[10] Discrimination also develops into a source of oppression, the action of recognizing someone as 'different' so much that they are treated inhumanly and degraded.[11]

This moralized definition of discrimination is distinct from a non-moralized definition - in the former, discrimination is wrong by definition, whereas in the latter, this is not the case.[12]

The United Nations stance on discrimination includes the statement: "Discriminatory behaviors take many forms, but they all involve some form of exclusion or rejection."[13] The United Nations Human Rights Council and other international bodies work towards helping ending discrimination around the world.

Types of discrimination[edit]

Age[edit]

Main articles: Ageism and Adultism

Ageism or age discrimination is discrimination and stereotyping based on the grounds of someone's age.[14] It is a set of beliefs, norms, and values which used to justify discrimination or subordination based on a person's age.[15] Ageism is most often directed toward elderly people, or adolescents and children.[16][17]

Age discrimination in hiring has been shown to exist in the United States. Joanna Lahey, professor at The Bush School of Government and Public Service at Texas A&M, found that firms are more than 40% more likely to interview a young adult job applicant than an older job applicant.[18] In Europe, Stijn Baert, Jennifer Norga, Yannick Thuy and Marieke Van Hecke, researchers at Ghent University, measured comparable ratios in Belgium. They found that age discrimination is heterogeneous by the activity older candidates undertook during their additional post-educational years. In Belgium, they are only discriminated if they have more years of inactivity or irrelevant employment.[19]

In a survey for the University of Kent, England, 29% of respondents stated that they had suffered from age discrimination. This is a higher proportion than for gender or racial discrimination. Dominic Abrams, social psychology professor at the university, concluded that ageism is the most pervasive form of prejudice experienced in the UK population.[20]

Caste[edit]

See also: Caste

According to UNICEF and Human Rights Watch, caste discrimination affects an estimated 250 million people worldwide and is mainly prevalent in parts of Asia (India, Sri Lanka, Bangladesh, Pakistan, Nepal, Japan) and Africa.[21][22] As of 2011, there were 200 million Dalits or Scheduled Castes (formerly known as "untouchables") in India.[23]

Disability[edit]

Main article: Disability discrimination

Discrimination against people with disabilities in favor of people who are not is called ableism or disablism. Disability discrimination, which treats non-disabled individuals as the standard of 'normal living', results in public and private places and services, educational settings, and social services that are built to serve 'standard' people, thereby excluding those with various disabilities. Studies have shown that disabled people not only need employment in order to be provided with the opportunity to earn a living but they also need employment in order to sustain their mental health and well-being. Work fulfils a number of basic needs for an individual such as collective purpose, social contact, status, and activity.[24] A person with a disability is often found to be socially isolated and work is one way to reduce his or her isolation.

In the United States, the Americans with Disabilities Act mandates the provision of equality of access to both buildings and services and is paralleled by similar acts in other countries, such as the Equality Act 2010 in the UK.

Language[edit]

Nationalists in Corsica sometimes spray-paint or shoot traffic signs in French.

This section is an excerpt from Linguistic discrimination.[edit]

Linguistic discrimination (also called glottophobia, linguicism and languagism) is unfair treatment of people which is based on their use of language and the characteristics of their speech, including their first language, their accent, the perceived size of their vocabulary (whether or not the speaker uses complex and varied words), their modality, and their syntax.[25] For example, an Occitan speaker in France will probably be treated differently from a French speaker.[26] Based on a difference in use of language, a person may automatically form judgments about another person's wealth, education, social status, character or other traits, which may lead to discrimination.

In the mid-1980s, linguist Tove Skutnabb-Kangas captured the idea of language-based discrimination as linguicism, which was defined as "ideologies and structures which are used to legitimize, effectuate,

and reproduce unequal divisions of power and resources (both material and non-material) between groups which are defined on the basis of language".[27] Although different names have been given to this form of discrimination, they all hold the same definition. Linguistic discrimination is culturally and socially determined due to preference for one use of language over others.

Scholars have analyzed the role of linguistic imperialism in linguicism, with some asserting that speakers of dominant languages gravitate towards discrimination against speakers of other, less dominant languages, while disadvantaging themselves linguistically by remaining monolingual.[28] According to scholar Carolyn McKinley, this phenomenon is most present in Africa, where the majority of the population speaks European languages introduced during the colonial era; African states are also noted as instituting European languages as the main medium of instruction, instead of indigenous languages.[28] UNESCO reports have noted that this has historically benefitted only the African upper class, conversely disadvantaging the majority of Africa's population who hold varying level of fluency in the European languages spoken across the continent.[28] Scholars have also noted impact of the linguistic dominance of English on academic discipline; scholar Anna Wierzbicka has described disciplines such as social science and humanities being "locked in a conceptual framework grounded in English" which prevents academia as a whole from reaching a "more universal, culture-independent perspective".[29]

Name[edit]

Discrimination based on a person's name may also occur, with researchers suggesting that this form of discrimination is present based on a name's meaning, its pronunciation, its uniqueness, its gender affiliation, and its racial affiliation.[30][31][32][33][34] Research has further shown that real world recruiters spend an average of just six seconds reviewing each résumé before making their initial "fit/no fit" screen-out decision and that a person's name is one of the six things they focus on most.[35] France has made it illegal to view a person's name on a résumé when screening for the initial list of most qualified candidates. Great Britain, Germany, Sweden, and the Netherlands have also experimented with name-blind summary processes.[36] Some apparent discrimination may be explained by other factors such as name frequency.[37] The effects of name discrimination based on a name's fluency is subtle, small and subject to significantly changing norms.[38]

Nationality[edit]

Discrimination on the basis of nationality is usually included in employment laws[39] (see above section for employment discrimination specifically). It is sometimes referred to as bound together with racial discrimination[40] although it can be separate. It may vary from laws that stop refusals of hiring based on nationality, asking questions regarding origin, to prohibitions of firing, forced retirement, compensation and pay, etc., based on nationality.

Discrimination on the basis of nationality may show as a "level of acceptance" in a sport or work team regarding new team members and employees who differ from the nationality of the majority of team members.[41]

In the GCC states, in the workplace, preferential treatment is given to full citizens, even though many of them lack experience or motivation to do the job. State benefits are also generally available for citizens only.[42] Westerners might also get paid more than other expatriates.[43]

Race or ethnicity[edit]

Main articles: Racism, Racial discrimination, Discrimination based on skin color, Ethnic penalty, and Racial segregation

Anti-Arab sign in Pattaya Beach, Thailand German warning in German-occupied Poland 1939 – "No entrance for Poles!" Antisemitic graffiti in Lithuania. The words read Juden raus (German for Jews out) and Hasse (presumably a misspelling of Hass, German for hate) An African-American child at a segregated drinking fountain on a courthouse lawn, North Carolina, US 1938.

Racial and ethnic discrimination differentiates individuals on the basis of real and perceived racial and ethnic differences and leads to various forms of the ethnic penalty.[44][45] It can also refer to the belief that groups of humans possess different behavioral traits corresponding to physical appearance and can be divided based on the superiority of one race over another.[46][47][48][49] It may also mean prejudice, discrimination, or antagonism directed against other people because they are of a different race or ethnicity.[47][48] Modern variants of racism are often based in social perceptions of biological differences between peoples. These views can take the form of social actions, practices or beliefs, or

political systems in which different races are ranked as inherently superior or inferior to each other, based on presumed shared inheritable traits, abilities, or qualities.[47][48][50] It has been official government policy in several countries, such as South Africa during the apartheid era. Discriminatory policies towards ethnic minorities include the race-based discrimination against ethnic Indians and Chinese in Malaysia[51] After the Vietnam War, many Vietnamese refugees moved to Australia and the United States, where they face discrimination.[52]

Region[edit]

See also: Regional discrimination in China

Regional or geographic discrimination is a form of discrimination that is based on the region in which a person lives or the region in which a person was born. It differs from national discrimination because it may not be based on national borders or the country in which the victim lives, instead, it is based on prejudices against a specific region of one or more countries. Examples include discrimination against Chinese people who were born in regions of the countryside that are far away from cities that are located within China, and discrimination against Americans who are from the southern or northern regions of the United States. It is often accompanied by discrimination that is based on accent, dialect, or cultural differences.[53]

Religious beliefs[edit]

Main article: Religious discrimination

Freedom of religion

show
Concepts

show
Status by country

show
Religious persecution

Religion portal

- v
- t
- e

 In the 1990s, Bhutan expelled its Hindu population or forced it to leave the country in order to preserve Bhutan's Buddhist culture and identity.

Religious discrimination is valuing or treating people or groups differently because of what they do or do not believe in or because of their feelings towards a given religion. For instance, the Jewish population of Germany, and indeed a large portion of Europe, was subjected to discrimination under Adolf Hitler and his Nazi party between 1933 and 1945. They were forced to live in ghettos, wear an identifying star of David on their clothes, and sent to concentration and death camps in rural Germany and Poland, where they were to be tortured and killed, all because of their Jewish religion. Many laws (most prominently the Nuremberg Laws of 1935) separated those of Jewish faith as supposedly inferior to the Christian population.

Restrictions on the types of occupations that Jewish people could hold were imposed by Christian authorities. Local rulers and church officials closed many professions to religious Jews, pushing them into marginal roles that were considered socially inferior, such as tax and rent collecting and moneylending, occupations that were only tolerated as a "necessary evil".[54] The number of Jews who were permitted to reside in different places was limited; they were concentrated in ghettos and banned from owning land. In Saudi Arabia, non-Muslims are not allowed to publicly practice their religions and they cannot enter Mecca and Medina.[55][56] Furthermore, private non-Muslim religious gatherings might be raided by the religious police.[56] In Maldives, non-Muslims living and visiting the country are prohibited from openly expressing their religious beliefs, holding public congregations to conduct religious activities, or involving Maldivians in such activities. Those expressing religious

beliefs other than Islam may face imprisonment of up to five years or house arrest, fines ranging from 5,000 to 20,000 rufiyaa ($320 to $1,300), and deportation.[57]

In a 1979 consultation on the issue, the United States commission on civil rights defined religious discrimination in relation to the civil rights which are guaranteed by the Fourteenth Amendment. Whereas religious civil liberties, such as the right to hold or not to hold a religious belief, are essential for Freedom of Religion (in the United States as secured by the First Amendment), religious discrimination occurs when someone is denied "equal protection under the law, equality of status under the law, equal treatment in the administration of justice, and equality of opportunity and access to employment, education, housing, public services and facilities, and public accommodation because of their exercise of their right to religious freedom".[58]

Sex, sex characteristics, gender, and gender identity[edit]

Main article: Sexism

See also: Homophobia, Misogyny, Misandry, Discrimination against intersex people, Transphobia, Discrimination towards non-binary gender persons, and Violence against LGBT people

Sexism is a form of discrimination based on a person's sex or gender. It has been linked to stereotypes and gender roles,[59][60] and may include the belief that one sex or gender is intrinsically superior to another.[61] Extreme sexism may foster sexual harassment, rape, and other forms of sexual violence.[62] Gender discrimination may encompass sexism and is discrimination toward people based on their gender identity[63] or their gender or sex differences.[64] Gender discrimination is especially defined in terms of workplace inequality.[64] It may arise from social or cultural customs and norms.[65]

Intersex persons experience discrimination due to innate, atypical sex characteristics. Multiple jurisdictions now protect individuals on grounds of intersex status or sex characteristics. South Africa was the first country to explicitly add intersex to legislation, as part of the attribute of 'sex'.[66] Australia was the first country to add an independent attribute, of 'intersex status'.[67][68] Malta was the first to adopt a broader framework of 'sex characteristics', through legislation that also ended modifications to the sex characteristics of minors undertaken for social and cultural reasons.[69][70] Global efforts such as the United Nations Sustainable Development Goal 5 is also aimed at ending all forms of discrimination on the basis of gender and sex.[71]

Sexual orientation[edit]

 LGBT activists at Cologne Pride carrying a banner with the flags of over 70 countries where homosexuality is illegal. Protests in New York City against Uganda's Anti-Homosexuality Bill.

See also: Heterosexism, Heteronormativity, Biphobia, and Homophobia

This section needs to be updated. Please help update this article to reflect recent events or newly available information. (January 2023)

One's sexual orientation is a "predilection for homosexuality, heterosexuality, or bisexuality".[72] Like most minority groups, homosexuals and bisexuals are vulnerable to prejudice and discrimination from the majority group. They may experience hatred from others because of their sexuality; a term for such hatred based upon one's sexual orientation is often called homophobia. Many continue to hold negative feelings towards those with non-heterosexual orientations and will discriminate against people who have them or are thought to have them. People of other uncommon sexual orientations also experience discrimination. One study found its sample of heterosexuals to be more prejudiced against asexual people than against homosexual or bisexual people.[73]

Employment discrimination based on sexual orientation varies by country. Revealing a lesbian sexual orientation (by means of mentioning an engagement in a rainbow organisation or by mentioning one's partner name) lowers employment opportunities in Cyprus and Greece but overall, it has no negative effect in Sweden and Belgium.[74][75][76][77] In the latter country, even a positive effect of revealing a lesbian sexual orientation is found for women at their fertile ages.

Besides these academic studies, in 2009, ILGA published a report based on research carried out by Daniel Ottosson at Södertörn University College, Stockholm, Sweden. This research found that of the 80 countries around the world that continue to consider homosexuality illegal, five carry the death penalty for homosexual activity, and two do in some regions of the country.[78] In the report, this is described as "State sponsored homophobia".[79] This happens in Islamic states, or in two cases regions under Islamic authority.[80][81] On February 5, 2005, the IRIN issued a reported titled "Iraq: Male

homosexuality still a taboo". The article stated, among other things that honor killings by Iraqis against a gay family member are common and given some legal protection.[82] In August 2009, Human Rights Watch published an extensive report detailing torture of men accused of being gay in Iraq, including the blocking of men's anuses with glue and then giving the men laxatives.[83] Although gay marriage has been legal in South Africa since 2006, same-sex unions are often condemned as "un-African".[84] Research conducted in 2009 shows 86% of black lesbians from the Western Cape live in fear of sexual assault.[85]

Further information: LGBT rights by country or territory

A number of countries, especially those in the Western world, have passed measures to alleviate discrimination against sexual minorities, including laws against anti-gay hate crimes and workplace discrimination. Some have also legalized same-sex marriage or civil unions in order to grant same-sex couples the same protections and benefits as opposite-sex couples. In 2011, the United Nations passed its first resolution recognizing LGBT rights.

Reverse discrimination[edit]

Main article: Reverse discrimination

See also: Bumiputera (Malaysia)

 Students protesting against racial quotas in Brazil: "Quer uma vaga? Passe no vestibular!" ("Do you want a spot? Pass the entrance exam!")

Reverse discrimination is discrimination against members of a dominant or majority group, in favor of members of a minority or historically disadvantaged group.[86] Groups may be defined in terms of disability, ethnicity, family status, gender identity, nationality, race, religion, sex, and sexual orientation, or other factors.[original research?]

This discrimination may seek to redress social inequalities under which minority groups have had less access to privileges enjoyed by the majority group. In such cases it is intended to remove discrimination that minority groups may already face. Reverse discrimination can be defined as the unequal treatment of members of the majority groups resulting from preferential policies, as in college admissions or employment, intended to remedy earlier discrimination against minorities.[87] Conceptualizing affirmative action as reverse discrimination became popular in the early- to mid-1970s, a time period that focused on under-representation and action policies intended to remedy the effects of past discrimination in both government and the business world.[88]

Anti-discrimination legislation[edit]

Main article: List of anti-discrimination acts

> This section needs expansion. You can help by adding to it. (July 2022)

Australia[edit]
- Racial Discrimination Act 1975
- Sex Discrimination Act 1984
- Disability Discrimination Act 1992
- Age Discrimination Act 2004

Canada[edit]
- Ontario Human Rights Code 1962
- Canadian Human Rights Act 1977 [89]

Hong Kong[edit]
- Sex Discrimination Ordinance (1996)[citation needed]

Israel[edit]
- Prohibition of Discrimination in Products, Services and Entry into Places of Entertainment and Public Places Law, 2000
- Employment (Equal Opportunities) Law, 1988
- Law of Equal Rights for Persons with Disabilities, 1998

Netherlands[edit]
- Article 137c, part 1 of Wetboek van Strafrecht prohibits insults towards a group because of its race, religion, sexual orientation (straight or gay), handicap (somatically, mental or psychiatric) in public or by speech, by writing or by a picture. Maximum imprisonment one year of imprisonment or a fine of the third category.[90][91]

- Part 2 increases the maximum imprisonment to two years and the maximum fine category to 4,[92] when the crime is committed as a habit or is committed by two or more persons.
- Article 137d prohibits provoking to discrimination or hate against the group described above. Same penalties apply as in article 137c.[93]
- Article 137e part 1 prohibits publishing a discriminatory statement, other than in formal message, or hands over an object (that contains discriminatory information) otherwise than on his request. Maximum imprisonment is 6 months or a fine of the third category.[90][94]
- Part 2 increases the maximum imprisonment to one year and the maximum fine category to 4,[92] when the crime is committed as a habit or committed by two or more persons.
- Article 137f prohibits supporting discriminatory activities by giving money or goods. Maximum imprisonment is 3 months or a fine of the second category.[95][96]

United Kingdom[edit]
- Equal Pay Act 1970 – provides for equal pay for comparable work.
- Sex Discrimination Act 1975 – makes discrimination against women or men, including discrimination on the grounds of marital status, illegal in the workplace.
- Human Rights Act 1998 – provides more scope for redressing all forms of discriminatory imbalances.
- Equality Act 2010 – consolidates, updates and supplements the prior Acts and Regulations that formed the basis of anti-discrimination law.[97][98][99]

United States[edit]
- Equal Pay Act of 1963[100] – (part of the Fair Labor Standards Act) – prohibits wage discrimination by employers and labor organizations based on sex.
- Civil Rights Act of 1964 – many provisions, including broadly prohibiting discrimination in the workplace including hiring, firing, workforce reduction, benefits, and sexually harassing conduct.[101]
- Fair Housing Act of 1968 prohibited discrimination in the sale or rental of housing based on race, color, national origin, religion, sex, familial status, or disability. The Office of Fair Housing and Equal Opportunity is charged with administering and enforcing the Act.
- Pregnancy Discrimination Act of 1978, which amended Title VII of the Civil Rights Act of 1964 – covers discrimination based upon pregnancy in the workplace.[102]
- Violence Against Women Act of 1994
- Racism still[when?] occurs in a widespread manner in real estate.[103]

United Nations documents[edit]
Important UN documents addressing discrimination include:
- The Universal Declaration of Human Rights is a declaration adopted by the United Nations General Assembly on December 10, 1948. It states that:" Everyone is entitled to all the rights and freedoms set forth in this Declaration, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status."[104]
- The International Convention on the Elimination of All Forms of Racial Discrimination (ICERD) is a United Nations convention. The Convention commits its members to the elimination of racial discrimination. The convention was adopted and opened for signature by the United Nations General Assembly on December 21, 1965, and entered into force on January 4, 1969.
- The Convention on the Elimination of All Forms of Discrimination against Women (CEDAW) is an international treaty adopted in 1979 by the United Nations General Assembly. Described as an international bill of rights for women, it came into force on September 3, 1981.
- The Convention on the Rights of Persons with Disabilities is an international human rights instrument treaty of the United Nations. Parties to the convention are required to promote, protect, and ensure the full enjoyment of human rights by persons with disabilities and ensure that they enjoy full equality under the law. The text was adopted by the United Nations General Assembly on December 13, 2006, and opened for signature on March 30, 2007. Following ratification by the 20th party, it came into force on May 3, 2008.

International cooperation[edit]
- Global Forum against Racism and Discrimination[105]
- The International Coalition of Inclusive and Sustainable Cities (ICCAR) launched by

UNESCO in 2004[106]
•        Routes of Enslaved Peoples project
Theories and philosophy[edit]
Social theories such as egalitarianism assert that social equality should prevail. In some societies, including most developed countries, each individual's civil rights include the right to be free from government sponsored social discrimination.[107] Due to a belief in the capacity to perceive pain or suffering shared by all animals, abolitionist or vegan egalitarianism maintains that the interests of every individual (regardless of their species), warrant equal consideration with the interests of humans, and that not doing so is speciesist.[108]

Philosophers have debated as to how inclusive the definition of discrimination should be. Some philosophers have argued that discrimination should only refer to wrongful or disadvantageous treatment in the context of a socially salient group (such as race, gender, sexuality etc.) within a given context. Under this view, failure to limit the concept of discrimination would lead to it being overinclusive; for example, since most murders occur because of some perceived difference between the perpetrator and the victim, many murders would constitute discrimination if the social salience requirement is not included. Thus this view argues that making the definition of discrimination overinclusive renders it meaningless. Conversely, other philosophers argue that discrimination should simply refer to wrongful disadvantageous treatment regardless of the social salience of the group, arguing that limiting the concept only to socially salient groups is arbitrary, as well as raising issues of determining which groups would count as socially salient. The issue of which groups should count has caused many political and social debates.[12]

Based on realistic-conflict theory[109] and social-identity theory,[110] Rubin and Hewstone[111] have highlighted a distinction among three types of discrimination:
1.        Realistic competition is driven by self-interest and is aimed at obtaining material resources (e.g., food, territory, customers) for the in-group (e.g., favoring an in-group in order to obtain more resources for its members, including the self).
2.        Social competition is driven by the need for self-esteem and is aimed at achieving a positive social status for the in-group relative to comparable out-groups (e.g., favoring an in-group in order to make it better than an out-group).
3.        Consensual discrimination is driven by the need for accuracy[112] and reflects stable and legitimate intergroup status hierarchies (e.g., favoring a high-status in-group because it is high status).
Labeling theory[edit]
An anti-discrimination education workshop at the Auschwitz Jewish Center, Poland, 2019
Discrimination, in labeling theory, takes form as mental categorization of minorities and the use of stereotype. This theory describes difference as deviance from the norm, which results in internal devaluation and social stigma[113] that may be seen as discrimination. It is started by describing a "natural" social order. It is distinguished between the fundamental principle of fascism and social democracy.[114][clarification needed] The Nazis in 1930s-era Germany and the pre-1990 Apartheid government of South Africa used racially discriminatory agendas for their political ends. This practice continues with some present day governments.[115]
Game theory[edit]
Economist Yanis Varoufakis (2013) argues that "discrimination based on utterly arbitrary characteristics evolves quickly and systematically in the experimental laboratory", and that neither classical game theory nor neoclassical economics can explain this.[116]
In 2002, Varoufakis and Shaun Hargreaves-Heap ran an experiment where volunteers played a computer-mediated, multiround hawk-dove game. At the start of each session, each participant was assigned a color at random, either red or blue. At each round, each player learned the color assigned to his or her opponent, but nothing else about the opponent. Hargreaves-Heap and Varoufakis found that the players' behavior within a session frequently developed a discriminatory convention, giving a Nash equilibrium where players of one color (the "advantaged" color) consistently played the aggressive "hawk" strategy against players of the other, "disadvantaged" color, who played the acquiescent "dove" strategy against the advantaged color. Players of both colors used a mixed strategy when playing against players assigned the same color as their own. The experimenters then added a cooperation option to the game, and found that disadvantaged players usually cooperated with each other, while

advantaged players usually did not. They state that while the equilibria reached in the original hawk-dove game are predicted by evolutionary game theory, game theory does not explain the emergence of cooperation in the disadvantaged group. Citing earlier psychological work of Matthew Rabin, they hypothesize that a norm of differing entitlements emerges across the two groups, and that this norm could define a "fairness" equilibrium within the disadvantaged group.[117]

See also[edit]

- Society portal
- Adultism
- Afrophobia
- Allport's Scale
- Anti-Arabism
- Anti-Catholicism
- Anti-intellectualism
- Anti-Iranian sentiment
- Anti-Mormonism
- Anti-Protestantism
- Antisemitism
- Antiziganism
- Aporophobia
- Apostasy
- Apostasy in Islam
- Atlantic slave trade
- Bias
- Bumiputera (Malaysia)
- Civil and political rights
- Classicide
- Cultural appropriation
- Cultural assimilation
- Cultural genocide
- Dehumanization
- Dignity
- Discrimination against asexual people
- Discrimination against atheists
- Discrimination against drug addicts
- Discrimination against members of the armed forces in the United Kingdom
- Discrimination against people with HIV/AIDS
- Discrimination based on skin color
- Discrimination of excellence
- Economic discrimination
- Equal opportunity
- Equal rights
- Ethnic cleansing
- Ethnocentrism
- Genetic discrimination
- Genocide
- Hate group
- Heightism
- Hispanophobia
- Homophobia
- Identicide
- In-group favoritism
- Ingroups and outgroups
- Institutional discrimination
- Institutional racism

- Intersectionality
- Intersex human rights
- Islamophobia
- Jim Crow laws
- List of countries by discrimination and violence against minorities
- Lookism
- Microaggression
- Nativism (politics)
- Oppression
- Persecution
- Politicide
- Psychological impact of discrimination on health
- Paradox of tolerance
- Racial segregation
- Religious intolerance
- Religious persecution
- Religious segregation
- Second-class citizen
- Sizeism
- Slavery
- Stigma management
- Structural discrimination
- Structural violence
- Supremacism
- Taste-based discrimination
- Xenophobia

References[edit]

1.      ^ "What drives discrimination and how do we stop it?". www.amnesty.org. Amnesty International. Retrieved October 13, 2020. Discrimination occurs when a person is unable to enjoy his or her human rights or other legal rights on an equal basis with others because of an unjustified distinction made in policy, law or treatment.

2.      ^ Jump up to:a b "Discrimination: What it is, and how to cope". American Psychological Association. October 31, 2019. Retrieved October 13, 2020. Discrimination is the unfair or prejudicial treatment of people and groups based on characteristics such as race, gender, age or sexual orientation.

3.      ^ "discrimination, definition". Cambridge Dictionaries Online. Cambridge University. Retrieved March 29, 2013.

4.      ^ Introduction to sociology. 7th ed. New York: W. W. Norton & Company Inc, 2009. p. 334.

5.      ^ "Definition of discrimination; Origin". Oxford Dictionaries. Oxford University. Archived from the original on May 14, 2013. Retrieved January 14, 2013.

6.      ^ Introduction to sociology (Print) (7th ed.). New York: W. W. Norton & Company Inc. 2009. p. 324.

7.      ^ Simpson, J.A., ed. (1989). The Oxford Dictionary. Vol. IV (2nd ed.). p. 758. ISBN 0-19861216-8.

8.      ^ Richard Tardif, ed. (1985). The Macquarie Concise Thesaurus — Australia's National Thesaurus. The Macquarie Library. ISBN 0-94975797-7.

9.      ^ Altman, Andrew (2020), "Discrimination", in Zalta, Edward N. (ed.), Stanford Encyclopedia of Philosophy (Summer 2020 ed.), Metaphysics Research Lab, Stanford University, retrieved October 13, 2020, [A]s a reasonable first approximation, we can say that discrimination consists of acts, practices, or policies that impose a relative disadvantage on persons based on their membership in a salient social group. [...] [W]e can refine the first-approximation account of discrimination and say that the moralized concept of discrimination is properly applied to acts, practices or policies that meet two conditions: a) they wrongfully impose a relative disadvantage or deprivation on persons based on their membership in some salient social group, and b) the wrongfulness rests (in part) on the fact that the imposition of the disadvantage is on account the group membership of the victims.

10.     ^ Kasper Lippert-Rasmussen, "Private Discrimination: A Prioritarian, Desert-Accommodating Account", San Diego Law Review, 43, 817-856 (2006); Oscar Horta, "Discrimination in Terms of Moral Exclusion", Theoria: Swedish Journal of Philosophy, 76, 346-364 (2010).

11.     ^ Thompson, Neil (2016). Anti-Discriminatory Practice: Equality, Diversity and Social Justice. Palgrave Macmillan. ISBN 978-1-137-58666-7.

12.     ^ Jump up to:a b Altman, Andrew (2020), "Discrimination", in Zalta, Edward N. (ed.), Stanford Encyclopedia of Philosophy (Summer 2020 ed.), Metaphysics Research Lab, Stanford University, retrieved December 29, 2020

13.     ^ "United Nations CyberSchoolBus: What is discrimination?". Archived from the original on June 1, 2014.

14.     ^ "Definition of Ageism". Oxford Dictionaries. Oxford University Press. Archived from the original on May 14, 2013. Retrieved December 4, 2012.

15.     ^ Kirkpatrick, George R.; Katsiaficas, George N.; Kirkpatrick, Robert George; Mary Lou Emery (1987). Introduction to critical sociology. Ardent Media. p. 261. ISBN 978-0-8290-1595-9. Retrieved January 28, 2011.

16.     ^ Wilkinson J and Ferraro K, "Thirty Years of Ageism Research". In Nelson T (ed). Ageism: Stereotyping and Prejudice Against Older Persons. Massachusetts Institute of Technology, 2002

17.     ^ "Young and Oppressed". youthrights.org. Retrieved April 11, 2012. Archived July 28, 2011, at the Wayback Machine

18.     ^ Lahey, J. (2005) Do Older Workers Face Discrimination? Boston College. Archived April 14, 2012, at the Wayback Machine

19.     ^ Baert, S., Norga, J., Thuy, Y., Van Hecke, M. (In press) Getting Grey Hairs in the Labour Market: An Alternative Experiment on Age Discrimination Journal of Economic Psychology.

20.     ^ (2006) How Ageist is Britain? London: Age Concern. Archived October 27, 2005, at the Wayback Machine

21.     ^ "Discrimination". UNICEF. Archived from the original on June 8, 2011.

22.     ^ "Global Caste Discrimination". Human Rights Watch. Archived from the original on November 15, 2008. Retrieved April 26, 2016.

23.     ^ "India: Official Dalit population exceeds 200 million". International Dalit Solidarity Network. May 29, 2013. Retrieved July 30, 2014.

24.     ^ Vornholt, Katharina; Sjir Uitdewilligen; Frans J.N. Nijhuis (December 2013). "Factors Affecting the Acceptance of People with Disabilities at Work: A Literature Review". Journal of Occupational Rehabilitation. 23 (4): 463–75. doi:10.1007/s10926-013-9426-0. PMID 23400588. S2CID 10038886.

25.     ^ "Language Discrimination - Workplace Fairness". www.workplacefairness.org. Midwest New Media. Retrieved August 13, 2021.

26.     ^ The Legal Aid Society-Employment Law Center, & the ACLU Foundation of North California (2002). Language Discrimination: Your Legal Rights. http://www.aclunc.org/library/publications/asset_upload_file489_3538.pdf Archived 4 September 2012 at the Wayback Machine

27.     ^ Quoted in Skutnabb-Kangas, Tove, and Phillipson, Robert, "'Mother Tongue': The Theoretical and Sociopolitical Construction of a Concept." In Ammon, Ulrich (ed.) (1989). Status and Function of Languages and Language Varieties, p. 455. Berlin, New York: Walter de Gruyter & Co. ISBN 3-11-011299-X.

28.     ^ Jump up to:a b c Dommisse, Ebbe (November 16, 2016). "Single dominant tongue keeps inequality in place". The Business Day. Retrieved October 14, 2020.

29.     ^ Anna Wierzbicka, Professor of Linguistics, Australian National University and author of 'Imprisoned by English, The Hazards of English as a Default Language, written in Natural Semantic Metalanguage (NSM), the universally convertible currency of communication, which can serve as a common auxiliary inter-language for speakers of different languages and a global means for clarifying, elucidating, storing, and comparing ideas" (194) (book review)

30.     ^ Silberzhan, Raphael (May 19, 2013). "It Pays to be Herr Kaiser". Psychological Science. 24 (12): 2437–2444. doi:10.1177/0956797613494851. PMID 24113624. S2CID 30086487.

31.     ^ Laham, Simon (December 9, 2011). "The name-pronunciation effect: Why people like Mr.

Smith more than Mr. Colquhoun". Journal of Experimental Social Psychology. 48 (2012): 752–756. doi:10.1016/j.jesp.2011.12.002. S2CID 6757690.

32. ^ Cotton, John (July 2007). "The "name game": affective and hiring reactions to first names". Journal of Managerial Psychology. 23 (1): 18–39. doi:10.1108/02683940810849648.

33. ^ Bertrand, Marianne (September 2004). "Are Emily and Brendan More Employable than Lakisha and Jamaal?" (PDF). The American Economic Review. 94 (4): 991–1013. doi:10.1257/0002828042002561.

34. ^ Easton, Stephen (June 30, 2017). "Blind recruiting study suggests positive discrimination common in the APS". The Mandarin.

35. ^ Smith, Jacquelyn (November 4, 2014). "Here's What Recruiters Look At In The 6 Seconds They Spend On Your Résumé". Business Insider.

36. ^ "No names, no bias". The Economist. October 29, 2015.

37. ^ Silberzhan, Raphael; Simonsohn, Uri; Uhlmann, Eric (February 4, 2014). "Matched-Names Analysis Reveals No Evidence of Name-Meaning Effects: A Collaborative Commentary on Silberzahn and Uhlmann" (PDF). Psychological Science. 25 (7): 1504–1505. doi:10.1177/0956797614533802. PMID 24866920. S2CID 26814316.

38. ^ "The Power of Names". The New York Times. May 29, 2013.

39. ^ Race, Color, National Origin and Ancestry, State of Wisconsin Archived October 24, 2012, at the Wayback Machine

40. ^ "Race and National Origin Discrimination". Office for Civil Rights. U.S. Department of Education. Retrieved December 16, 2017.

41. ^ Christiane Schwieren, Mechanisms Underlying Nationality-Based Discrimination in Teams. A Quasi-Experiment Testing Predictions From Social Psychology and Microeconomics Archived 2015-12-31 at the Wayback Machine, Maastricht University

42. ^ Ayesha Almazroui. "Emiratisation won't work if people don't want to learn". Retrieved April 26, 2016.

43. ^ "'Western workers favoured in UAE', survey respondents say". The National. April 18, 2015. Retrieved July 8, 2019.

44. ^ Kislev, Elyakim (September 19, 2016). "Deciphering the 'Ethnic Penalty' of Immigrants in Western Europe: A Cross-Classified Multilevel Analysis". Social Indicators Research. 134 (2): 725–745. doi:10.1007/s11205-016-1451-x. S2CID 157454886.

45. ^ Carmichael, F.; Woods, R. (2000). "Ethnic Penalties in Unemployment and Occupational Attainment: Evidence for Britain". International Review of Applied Economics. 14 (1): 71–98. doi:10.1080/026921700101498. S2CID 154020583.

46. ^ Dennis, Rutledge M. (1995). "Social Darwinism, scientific racism, and the metaphysics of race". Journal of Negro Education. 64 (3): 243–52. doi:10.2307/2967206. JSTOR 2967206.

47. ^ Jump up to:a b c Racism Oxford Dictionaries

48. ^ Jump up to:a b c Ghani, Navid (2008). "Racism". In Schaefer, Richard T. (ed.). Encyclopedia of Race, Ethnicity, and Society. SAGE. pp. 1113–1115. ISBN 978-1-4129-2694-2.

49. ^ Newman, D. M. (2012). Sociology : exploring the architecture of everyday life (9th ed.). Los Angeles: SAGE. p. 405. ISBN 978-1-4129-8729-5. racism: Belief that humans are subdivided into distinct groups that are different in their social behavior and innate capacities and that can be ranked as superior or inferior.

50. ^ Newman, D.M. (2012). Sociology: exploring the architecture of everyday life (9th ed.). Los Angeles: Sage. p. 405. ISBN 978-1-4129-8729-5. racism: Belief that humans are subdivided into distinct groups that are different in their social behavior and innate capacities and that can be ranked as superior or inferior.

51. ^ "Malaysia's lingering ethnic divide". March 4, 2008. BBC News.

52. ^ Levine, Bertram. (2005). "Not All Black and White". J. Cropp (Ed.), Resolving Racial Conflict, 193-218. London: University of Missouri Press.

53. ^ "Accent Discrimination Law and Legal Definition". USLegal.

54. ^ "Did Discrimination Enhance Intelligence of Jews?". National Geographic News. July 18, 2005 Archived December 6, 2010, at the Wayback Machine

55. ^ Sandra Mackey's account of her attempt to enter Mecca in Mackey, Sandra (1987). The

Saudis: Inside the Desert Kingdom. W. W. Norton & Company. pp. 63–64. ISBN 978-0-393-32417-4.

56.    ^ Jump up to:a b Department Of State. The Office of Electronic Information, Bureau of Public Affairs (September 19, 2008). "Saudi Arabia". 2001-2009.state.gov. Retrieved July 24, 2019.

57.    ^ "Maldives". United States Department of State. Retrieved March 30, 2022.

58.    ^ U.S. Commission on Civil Rights, 1979: Religious discrimination. A neglected issue. A consultation sponsored by the United States Commission on Civil Rights, Washington. D.C., April 9–10, 1979

59.    ^ Matsumoto, David (2001). The Handbook of Culture and Psychology. Oxford University Press. p. 197. ISBN 978-0-19-513181-9.

60.    ^ Nakdimen, K. A. (1984). "The Physiognomic Basis of Sexual Stereotyping". American Journal of Psychiatry. 141 (4): 499–503. doi:10.1176/ajp.141.4.499. PMID 6703126.

61.    ^ Witt, Jon (2017). SOC 2018 (5th ed.). New York: McGraw-Hill Education. ISBN 9781259702723. OCLC 968304061.[page needed]

62.    ^ Forcible Rape Institutionalized Sexism in the Criminal Justice System| Gerald D. Robin Division of Criminal Justice, University of New Haven

63.    ^ Macklem, Tony (2003). Beyond Comparison: Sex and Discrimination. New York: Cambridge University Press. ISBN 978-0-521-82682-2.

64.    ^ Jump up to:a b Sharyn Ann Lenhart (2004). Clinical Aspects of Sexual Harassment and Gender Discrimination: Psychological Consequences and Treatment Interventions. Routledge. p. 6. ISBN 978-1135941314. Retrieved April 20, 2018. GENDER OR SEX DISCRIMINATION: This term refers to the types of gender bias that have a negative impact. The term has legal, as well as theoretical and psychological, definitions. Psychological consequences can be more readily inferred from the latter, but both definitions are of significance. Theoretically, gender discrimination has been described as (1) the unequal rewards that men and women receive in the workplace or academic environment because of their gender or sex difference (DiThomaso, 1989); (2) a process occurring in work or educational settings in which an individual is overtly or covertly limited access to an opportunity or a resource because of a sex or is given the opportunity or the resource reluctantly and may face harassment for picking it (Roeske & Pleck, 1983); or (3) both.

65.    ^ Christina Macfarlane, Sean Coppack and James Masters (September 12, 2019). "FIFA must act after death of Iran's 'Blue Girl,' says activist". CNN.

66.    ^ Judicial Matters Amendment Act, No. 22 of 2005, Republic of South Africa, Vol. 487, Cape Town, January 11, 2006.

67.    ^ "Australian Parliament, Explanatory Memorandum to the Sex Discrimination Amendment (Sexual Orientation, Gender Identity and Intersex Status) Bill 2013". Archived from the original on December 19, 2014. Retrieved October 6, 2014.

68.    ^ We welcome the Senate Inquiry report on the Exposure Draft of the Human Rights and Anti-Discrimination Bill 2012 Archived 2014-01-01 at the Wayback Machine, Organisation Intersex International Australia, February 21, 2013.

69.    ^ Cabral, Mauro (April 8, 2015). "Making depathologization a matter of law. A comment from GATE on the Maltese Act on Gender Identity, Gender Expression and Sex Characteristics". Global Action for Trans Equality. Archived from the original on July 4, 2015. Retrieved July 3, 2015.

70.    ^ "OII-Europe applauds Malta's Gender Identity, Gender Expression and Sex Characteristics Act. This is a landmark case for intersex rights within European law reform". Oii Europe. April 1, 2015. Retrieved January 17, 2023.

71.    ^ sdgcounting (June 6, 2017). "SDG 5 Indicators". Medium. Retrieved September 23, 2020.

72.    ^ World English Dictionary, "Sexual Orientation"

73.    ^ MacInnis, Cara C.; Hodson, Gordon (2012). "Intergroup bias toward "Group X": Evidence of prejudice, dehumanization, avoidance, and discrimination against asexuals". Group Processes & Intergroup Relations. 15 (6): 725–743. doi:10.1177/1368430212442419. S2CID 3056711.

74.    ^ Drydakis, Nick (2011). "Women's Sexual Orientation and Labor Market Outcomes in Greece". Feminist Economics. 17: 89–117. doi:10.1080/13545701.2010.541858. S2CID 154771144.

75.    ^ Drydakis, Nick (2014). "Sexual orientation discrimination in the Cypriot labour market. Distastes or uncertainty?". International Journal of Manpower. 35 (5): 720–744. doi:10.1108/IJM-02-2012-0026. hdl:10419/62444. S2CID 10103299.

76.    ^ Ahmed, A. M., Andersson, L., Hammarstedt, M. (2011) Are gays and lesbians discriminated against in the hiring situation? Archived 2015-05-29 at the Wayback Machine Institute for Labour Market Policy Evaluation Working Paper Series 21.

77.    ^ Baert, Stijn (2014). "Career lesbians. Getting hired for not having kids?". Industrial Relations Journal. 45 (6): 543–561. CiteSeerX 10.1.1.467.2102. doi:10.1111/irj.12078. S2CID 34331459.

78.    ^ "New Benefits for Same-Sex Couples May Be Hard to Implement Abroad". ABC News. June 22, 2009.

79.    ^ "ILGA: 2009 Report on State Sponsored Homophobia (2009)" (PDF). Archived from the original (PDF) on May 2, 2010.

80.    ^ "ILGA:7 countries still put people to death for same-sex acts". Archived from the original on October 29, 2009.

81.    ^ "Islamic views of homosexuality". Archived from the original on April 15, 2015. Retrieved April 26, 2016.

82.    ^ "AU welcomes progress in peace process". IRIN. September 29, 2004. Retrieved April 26, 2016.

83.    ^ "They Want Us Exterminated". Human Rights Watch. August 16, 2009.

84.    ^ Harrison, Rebecca. "South African gangs use rape to "cure" lesbians". Reuters. March 13, 2009.

85.    ^ Kelly, Annie (March 12, 2009). "Raped and killed for being a lesbian: South Africa ignores 'corrective' attacks". The Guardian.

86.    ^ "Reverse Discrimination". Findlaw. Retrieved January 17, 2023.

87.    ^ "Reverse Discrimination". dictionary.com.

88.    ^ Embrick, David G. (2008). "Affirmative Action in Education". In Schaefer, Richard T. (ed.). Encyclopedia of Race, Ethnicity, and Society, Volume 1. SAGE. pp. 12–19. ISBN 978-1-41-292694-2.

89.    ^ "What is Discrimination?". Canadian Human Rights Commission. Archived from the original on April 15, 2018. Retrieved April 15, 2018.

90.    ^ Jump up to:a b € 7,800

91.    ^ "wetten.nl – Regeling – Wetboek van Strafrecht – BWBR0001854". Retrieved April 26, 2016.

92.    ^ Jump up to:a b € 19,500

93.    ^ "wetten.nl – Regeling – Wetboek van Strafrecht – BWBR0001854". Retrieved April 26, 2016.

94.    ^ "wetten.nl – Regeling – Wetboek van Strafrecht – BWBR0001854". Retrieved April 26, 2016.

95.    ^ € 3,900

96.    ^ "wetten.nl – Regeling – Wetboek van Strafrecht – BWBR0001854". Retrieved April 26, 2016.

97.    ^ "Equality considerations under the Equality Act 2010, including fulfilment of the PSED for the Collective Agreed Framework in relation to annual leave payments: additional guidance". GOV.UK. Retrieved July 5, 2021.

98.    ^ "Chapter 1: Introduction and overview of the programme". GOV.UK. Retrieved July 5, 2021.

99.    ^ "Equality Act 2010: guidance". GOV.UK. Retrieved July 5, 2021.

100.    ^ "Equal Pay Act of 1963 – EPA – 29 U.S. Code Chapter 8 § 206(d)". Archived from the original on November 23, 2011. Retrieved April 26, 2016.

101.    ^ "Civil Rights Act of 1964 – CRA – Title VII – Equal Employment Opportunities – 42 US Code Chapter 21". Archived from the original on December 29, 2011. Retrieved April 26, 2016.

102.    ^ "Pregnancy Discrimination Act". Retrieved May 14, 2008.

103.    ^ Bouie, Jamelle (May 13, 2015). "A Tax on Blackness". Slate. ISSN 1091-2339. Retrieved May 18, 2017.

104.    ^ "The Universal Declaration of Human Rights". Archived from the original on December 8, 2014.

105.    ^ "Global Forum against Racism and Discrimination UNESCO". OHCHR. Retrieved June 5, 2023.

106.    ^ "ICCAR | ECCAR". www.eccar.info. Retrieved June 5, 2023.

107.     ^ "Civil rights". Archived from the original on October 23, 1999. Retrieved March 20, 2019.

108.     ^ Singer, Peter (1999) [1993]. "Equality for Animals?". Practical Ethics (Second ed.). Cambridge: Cambridge University Press. pp. 57–58. ISBN 978-0-521-43971-8. If a being suffers, there can be no moral justification for refusing to take that suffering into consideration. ... This is why the limit of sentience ... is the only defensible boundary of concern for the interests of others. ... Similarly those I would call 'speciesists' give greater weight to their own species when there is a clash between their interests and the interests of those of other species.

109.     ^ Sherif, M. (1967). Group conflict and co-operation. London: Routledge.

110.     ^ Tajfel, H.; Turner, J. C. (1979). "An integrative theory of intergroup conflict". In Austin, W.G.; Worchel, S. (eds.). The social psychology of intergroup relations. Monterey, CA: Brooks/Cole. pp. 33–47.

111.     ^ Rubin, M.; Hewstone, M.; et al. (2004). "Social identity, system justification, and social dominance: Commentary on Reicher, Jost et al., and Sidanius et al". Political Psychology. 25 (6): 823–844. doi:10.1111/j.1467-9221.2004.00400.x. hdl:1959.13/27347.

112.     ^ "Prejudice & Discrimination Theories #2". Keith E Rice's Integrated SocioPsychology Blog & Pages. Retrieved January 17, 2023.

113.     ^ Slattery, M. (2002). Key Ideas in Sociology. Nelson Thornes. pp. 134–137. ISBN 978-0-7487-6565-2.

114.     ^ Skoll, Geoffrey R. (2010). "The Theory of Fear / Chapter 3 / States and Social Control" (PDF). The Theory of Fear. doi:10.1057/9780230112636_3.

115.     ^ Adam, Heribert (July 1, 1996). "Anti-Semitism and Anti-Black Racism: Nazi Germany and Apartheid South Africa". Telos. 1996 (108): 25–46. doi:10.3817/0696108025. S2CID 145360794.

116.     ^ Yanis Varoufakis (2013). "Chapter 11: Evolving domination in the laboratory". Economic Indeterminacy: A personal encounter with the economists' peculiar nemesis. Routledge Frontiers of Political Economy. Routledge. p. 13. ISBN 978-0-415-66849-1.

117.     ^ Shaun Hargreaves-Heap; Yanis Varoufakis (July 2002), "Some experimental evidence on the evolution of discrimination, co-operation and perceptions of fairness", The Economic Journal, 112 (481): 679–703, doi:10.1111/1468-0297.00735, S2CID 59133304

External links[edit]

Wikiquote has quotations related to Discrimination.

Look up discrimination in Wiktionary, the free dictionary.
Library resources about
Discrimination

- Resources in your library
- Resources in other libraries

- Topics.law.cornell.edu
- Legal definitions
o     Australia
o     Canada
o     Russia
o     US
- Discrimination Laws in Europe
- Behavioral Biology and Racism

Racial equality is when people of all races and ethnicities are treated in an egalitarian/equal manner.[1] Racial equality occurs when institutions give individuals legal, moral, and political rights.[2] In present-day Western society, equality among races continues to become normative. Prior to the early 1960s, attaining equality was difficult for African, Asian, and Indigenous people.[3] However, in more recent years, legislation is being passed ensuring that all individuals receive equal opportunities in treatment, education, employment, and other areas of life.[2]

Discriminatory intent and disparate impact[edit]

Main article: Disparate impact

Because inequalities can be caused either intentionally or unintentionally, the Supreme Court has decided that the Equal Protection Clause itself does not forbid governmental policies that unintentionally lead to racial disparities, though Congress may have some power under other clauses of the Constitution to address unintentional disparate impacts. This subject was addressed in the seminal case of Arlington Heights v. Metropolitan Housing Corp. (1977). In that case, the plaintiff, a housing developer, sued a city in the suburbs of Chicago that had refused to re-zone a plot of land on which the plaintiff intended to build low-income, racially integrated housing. On the face, there was no clear evidence of racially discriminatory intent on the part of Arlington Heights's planning commission. The result was racially disparate, however, since the refusal supposedly prevented mostly African-Americans and Hispanics from moving in. Justice Lewis Powell, writing for the Court, stated, "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." Disparate impact merely has an evidentiary value; absent a "stark" pattern, "impact is not determinative."[76]

The result in Arlington Heights was similar to that in Washington v. Davis (1976), and has been defended on the basis that the Equal Protection Clause was not designed to guarantee equal outcomes, but rather equal opportunities; if a legislature wants to correct unintentional but racially disparate effects, it may be able to do so through further legislation.[77] It is possible for a discriminating state to hide its true intention, and one possible solution is for disparate impact to be considered as stronger evidence of discriminatory intent.[78] This debate, though, is currently academic, since the Supreme Court has not changed its basic approach as outlined in Arlington Heights.

For an example of how this rule limits the Court's powers under the Equal Protection Clause, see McClesky v. Kemp (1987). In that case a black man was convicted of murdering a white police officer and sentenced to death in the state of Georgia. A study found that killers of whites were more likely to be sentenced to death than were killers of blacks.[79] The Court found that the defense had failed to prove that such data demonstrated the requisite discriminatory intent by the Georgia legislature and executive branch.

The "Stop and Frisk" policy in New York allows officers to stop anyone who they feel looks suspicious. Data from police stops shows that even when controlling for variability, people who are black and those of Hispanic descent were stopped more frequently than white people, with these statistics dating back to the late 1990s. A term that has been created to describe the disproportionate number of police stops of black people is "Driving While Black." This term is used to describe the stopping of innocent black people who are not committing any crime.

In addition to concerns that a discriminating statute can hide its true intention, there have also been concerns that facially neutral evaluative and statistical devices that are permitted by decision-makers can be subject to racial bias and unfair appraisals of ability.'[80] As the equal protection doctrine heavily relies on the ability of neutral evaluative tools to engage in neutral selection procedures, racial biases indirectly permitted under the doctrine can have grave ramifications and result in 'uneven conditions.' '[80][81] These issues can be especially prominent in areas of public benefits, employment, and college admissions, etc.'[80]

Voting rights

3/ U.S. Code § 6711 - Prohibited discrimation

Racial Profiling: Constitutional and Statutory Considerations for Congress July 24, 2020 Protests over the death of George Floyd in police custody have prompted renewed interest in police reform efforts. One particular area of focus has been the issue of racial profiling by state and local police officials, with some commentators arguing that police departments may disproportionately target people of color for traffic stops, questioning, or search procedures without individualized grounds for suspecting criminal activity. This Sidebar addresses federal law's constraints on racial profiling, describes existing enforcement actions, and highlights selected proposals for congressional action. Existing Law State and local governments have primary responsibility for law enforcement, and Congress, while having broader authority over federal law enforcement, has relatively limited authority to regulate state and municipal police departments. That said, the Constitution and federal statutes set some rules for police actions, including in the area of racial profiling. Most relevant here, the Fourth Amendment requires

individual justification for searches and seizures, and the Equal Protection Clause bars most law enforcement decisions based on race. In addition, two federal statutes, 34 U.S.C. § 12601 and Title VI of the Civil Rights Act of 1964, allow for racial profiling suits against police departments. Fourth Amendment Constraints on Searches and Seizures The Fourth Amendment to the Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." It does not specifically prohibit racial profiling, but courts would not consider stops and searches based solely on a subject's race to be reasonable seizures because police have identified no individualized reason for suspicion. The Amendment has been interpreted to permit police to detain a person briefly for investigative purposes if an officer has a reasonable suspicion "that criminal activity may be afoot." A mere "hunch" or inarticulable suspicion does not meet this standard. And "law enforcement officers must satisfy escalating legal standards of 'reasonableness' for each level of intrusion upon a person—stop, search, seizure, and arrest." Courts have held that an officer cannot meet the Fourth Amendment standard by relying on a person's racial appearance, alone, as grounds for reasonable suspicion. By contrast, the officer may use race, for Congressional Research Service https://crsreports.congress.gov LSB10524 Congressional Research Service 2 example, searching for a person matching a suspect's description and part of that description is the suspect's race. That said, an officer's groundless use of race by itself does not violate the Fourth Amendment; it is performing a search or seizure without individualized justification that violates this provision. As long as they can point to individualized justification, the personal motives of an officer are not a factor in the Fourth Amendment analysis. Police may pull over a driver for a traffic violation, even if they intend to search for drugs. The standard is an objective one. "[T]he constitutional reasonableness" of stops depends on the circumstances, not on the officers' "actual motivations." In practice, some observers, researchers, and judges say it can be hard to tell whether officers' investigatory detentions rely on individual, nonracial factors as the Fourth Amendment jurisprudence requires. Determining reasonable suspicion based on objective standards allows for any number of justifications. The possible factors that could be raised led one judge to assert, "whether you stand still or move, drive above, below, or at the speed limit, you will be described by the police as acting suspiciously should they wish to stop or arrest you." As a result, when a police report cites a cause for a particular stop, such as a pedestrian's furtive movements or motorist's erratic driving, critics claim that such explanations could amount to pretext or post-hoc validation. Some police departments accept diverse actions as "furtive," for example, and records reviews may show that "time of day"—also cited as justification—can validate stops at all times of day. Police have also used claims that pedestrians are "milling," "loitering," or "wandering" as reasons for a stop. The objective standard and the many ways police can potentially meet Fourth Amendment standards makes it challenging for courts to evaluate whether a stop is based on suspicious circumstances or on race alone. When courts have found patterns of Fourth Amendment violations, some courts have attributed them to failure to train officers about constitutional requirements, loose supervision of officers on the beat, or lax documentation requirements for stops and searches. In some cases, courts have found that these procedures allow or encourage officers to conduct searches and seizures based on race. In New York, a federal judge concluded that "quotas" or goals for numbers of stops, arrests, or other activities led officers to rely on race instead of individualized suspicion as officers "increase[s] stops without due regard to the constitutionality of those stops."Along the same lines, the Department of Justice concluded, in an investigation of Newark police, that minority communities often "bear the brunt of the . . . pattern of unconstitutional policing." Newark's "failure to require its officers to adhere to legal standards for stops facilitate[d] impermissible reliance on race." Nonetheless, because of the interpretations of the Fourth Amendment in terms of justifying a stop, it may be difficult to address racial profiling by relying on the Fourth Amendment alone. Equal Protection and Police Activity Even stops that courts find to be justifiable under the Fourth Amendment can violate the Equal Protection Clause of the Fourteenth Amendment. This is because while the Fourth Amendment protects against unreasonable searches, the Equal Protection Clause also requires that policing, like other government functions, afford all persons the equal protection of the laws. It is the Equal Protection Clause, and not the Fourth Amendment, that forms "the constitutional basis for objecting to intentionally discriminatory application of laws." Equal-protection violations can be subtle, as when neutral rules are applied "in an intentionally discriminatory manner" or have an adverse effect motivated by discriminatory animus. The Equal Protection Clause's prohibition on intentional racial

discrimination remains true even if members of a given race are responsible for more crimes in a particular neighborhood or commit more crimes of a certain type. One federal judge observed, "[t]he Equal Protection Clause does not permit the police to target a racially defined group as a whole because of the misdeeds of some of its members." And even if the evidence showed that police relied on racial profiling out of a perhaps ill-conceived notion that it helped fight crime, the Equal Protection Clause prohibits intentionally relying on race in policing, no matter the underlying rationale for the policy. Congressional Research Service 3 But unintentional racial impact does not violate equal protection standards. To make out a constitutional challenge, "plaintiffs must show that those responsible for the profiling did so 'at least in part "because of," not merely "in spite of," its adverse effects upon' the profiled racial groups." Such cases are hard to prove. Some argue that an individual person stopped and frisked may not be sure if officers selected him or her because of race, and discriminatory intent is often difficult to determine. In practice, investigators and courts have in limited cases uncovered express police policies targeting people of color. One New York police commissioner admitted that he "focused on young blacks and Hispanics 'because he wanted to instill fear in them, every time they leave their home, they could be stopped by the police.'" A court in Arizona concluded that a local sheriff department had unconstitutionally "institutionalize[d] the systematic consideration of race as one factor among others in forming reasonable suspicion or probable cause in making law enforcement decisions." That said, a court would usually need to be swayed by an agency's "official" policies of race neutrality when it evaluates the requisite racial intent. In Maricopa County, Arizona, for example, a court found that police issued some policies "designed to 'avoid the perception of racial profiling'" and noted leaders conceded they were "rhetoric." In many other cases, plaintiffs have shown some racial disparities but failed to show racial intent. A plaintiff needs more than statistics alone to prove intentional discrimination. Isolated incidents and innuendo rarely suffice to establish intent. One federal judge rejected plaintiff's claim that a handful of statements, including an officer "justif[ying] the stop by saying that one can never tell with 'you people,'" showed racial intent. Federal Statutes and Racial Profiling A handful of federal statutes facilitate racial profiling suits. Some statutes, 42 U.S.C. § 1983, 34 U.S.C. § 12601 (Section 12601), and 18 U.S.C. § 242 (Section 242), create causes of action for violations of constitutional rights. Under Section 242, individual officers can face criminal prosecution for using police authority to "willfully subject[ ] any person . . . to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States[.]" Under a noncriminal provision, 34 U.S.C. § 12601 (Section 12601), the Department of Justice can investigate and impose reforms on departments engaging in a "pattern or practice" of constitutional violations. A private person subjected to unlawful racial profiling may seek remedies under 42 U.S.C. § 1983 (Section 1983), which protects persons from "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. A plaintiff may bring a Section 1983 suit against a state or local government official (such as a law enforcement officer), or directly against a municipality or municipal agency (such as a police department). To succeed in suing a police department, a private party must show injury from a "policy or custom" of the municipality, including a "deliberate indifference" to the risk of a constitutional or statutory violation. Individual police officers are liable under Section 1983 only if they violate "clearly established" law. In practice, some argue these rules usually shield police and police departments from liability absent egregious or ongoing violations. Congressional Research Service 4 Another statute, Title VI, also reaches racial profiling. Unlike the statutes previously discussed, which enforce constitutional norms, Title VI creates a new cause of action that prohibits discrimination on the basis of race, color, sex, religion, or national origin by the recipients of certain federal funds. Title VI can provide an easier route for bringing a racial profiling claim, at least under DOJ's enforcement authority. For a Title VI claim, DOJ need not show intentional discrimination; it can identify practices that have a disproportionate effect, or "disparate impact" because of race that is "unintentional, but avoidable." To prevail, DOJ must identify a police practice causing a disparate impact, and the police department may then defend the practice if it shows that it is necessary for proper law enforcement. Because it is hard to prove that officers or departments intended to discriminate, Title VI can sometimes be invoked more easily against race-based enforcement actions. Private plaintiffs, in contrast, must prove intentional discrimination in a Title VI claim. A statistical disparity is insufficient. It is enough, however, if plaintiffs show that race was "a motivating factor" in a discrimination claim, even if other factors played a role. In one case, Hispanic

plaintiffs stated a valid Title VI claim when they alleged that ethnicity and immigration concerns motivated an Arizona sheriff's office to target them for stops. Racial Profiling Litigation To determine whether a police department engages in illicit racial profiling, courts look at metrics such as how often people of color are subjected to stops and searches relative to their portion of the population; whether searches frequently turn up contraband; and how often stopslead to an arrest or charges. Litigants must generally compile a significant body of statistical and anecdotal evidence to prevail in a profiling case. A profiling case in Newark shows one of the possible difficulties in bringing profiling cases: acquiring and analyzing large data sets. Astatistician, working for a group of private attorneys, counted turnpike drivers, speeders, and traffic stops by race. The researcher reported his study required "careful design, teams of researchers with binoculars[,] and a rolling survey." Ultimately, profiling victims used the study to exclude improperly obtained evidence and the Department of Justice, learning of the results, brought its own Section 12601 action. Other cases further show the complexity of this type of litigation. A private suit in New York City revealed the jurisdiction conducted over 4.4 million pedestrian stops between 2004 and 2014. Analysis of the stops showed they targeted black and Hispanic residents. A court, finding equal protection violations, held that blacks and Hispanics were also "more likely to be subjected to the use of force than whites." Considerations for Congress Recent legislative proposals have included many provisions related to police reform. The Justice in Policing Act would define racial profiling as "a law enforcement agent or agency relying, to any degree, on actual or perceived race, ethnicity, national origin, religion, gender, gender identity, or sexual orientation" in planning law enforcement activities. Even "spontaneous investigatory activities" would fall under the Act's purview if they have "a disparate impact" on a covered group. Under the proposed statutory cause of action and in contrast to suits based on an equal-protection analysis, individuals would not have to prove intent; they could prevail by showing only an unjustified, discriminatory effect. The Department of Justice or individual victims would be able to enforce the law in either federal or state court. The bill would require federal law enforcement agencies to revise policies to eliminate profiling; it would also provide funding and training for state and local agencies and require funded agencies to set up administrative complaint procedures to address profiling allegations. The Just and Unifying Solutions To Invigorate Communities Everywhere Act of 2020 (JUSTICE Act) would also direct training development and would condition funding on training and reporting, aiming to stem racial profiling. More general Congressional Research Service 5 LSB10524· VERSION 2 · NEW proposals in these comprehensive bills would aim to improve bias awareness, promote hiring diversity, and track officer misconduct to evaluate patterns. Another Legal Sidebar compares provisions of those comprehensive proposals.
Title II Of The Civil Rights Act (Public Accommodations)
42 U.S.C. §2000a (a)All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination on the ground of race, color, religion, or national origin.
42 U.S. Code § 18116 - Nondiscrimination
a)IN GENERAL
Except as otherwise provided for in this title [1] (or an amendment made by this title),[1] an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), or section 794 of title 29, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title [1] (or amendments). The enforcement mechanisms provided for and available under such title VI, title IX, section 794, or such Age Discrimination Act shall apply for purposes of violations of this subsection.
(b)CONTINUED APPLICATION OF LAWS
Nothing in this title 1 (or an amendment made by this title) 1 shall be construed to invalidate or limit the rights, remedies, procedures, or legal standards available to individuals aggrieved under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), section 794 of title 29, or the Age Discrimination Act of 1975 [42 U.S.C. 6101 et seq.], or to supersede State

laws that provide additional protections against discrimination on any basis described in subsection (a).

4 Amendment

The right of the people to be secure in their persons, houses, papers, and effects,[a] against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.[2

English law[edit]

Charles Pratt, 1st Earl Camden established the English common law precedent against general search warrants.

Like many other areas of American law, the Fourth Amendment finds its origin in English legal doctrine. In Semayne's case (1604), Sir Edward Coke stated: "The house of every one is to him as his castle and fortress, as well for his defence against injury and violence as for his repose."[3] Semayne's Case acknowledged that the King did not have unbridled authority to intrude on his subjects' dwellings, but recognized that government agents were permitted to conduct searches and seizures under certain conditions when their purpose was lawful and a warrant had been obtained.[4]

The 1760s saw a growth in the intensity of litigation against state officers, who are using general warrants, conducted raids in search of materials relating to John Wilkes's publications. The most famous of these cases involved John Entick whose home was forcibly entered by the King's Messenger Nathan Carrington, along with others, pursuant to a warrant issued by George Montagu-Dunk, 2nd Earl of Halifax authorizing them "to make strict and diligent search for ... the author, or one concerned in the writing of several weekly very seditious papers entitled, 'The Monitor or British Freeholder, No 257, 357, 358, 360, 373, 376, 378, and 380'", the search resulting in seizure of printed charts, pamphlets and other materials. Entick filed suit in Entick v Carrington, argued before the Court of King's Bench in 1765. Charles Pratt, 1st Earl Camden ruled that both the search and the seizure were unlawful, as the warrant authorized the seizure of all of Entick's papers—not just the criminal ones—and as the warrant lacked probable cause to even justify the search. By holding that "[O]ur law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave",[5] Entick established the English precedent that the executive is limited in intruding on private property by common law.[4]

14 amendment

Equal Protection Clause

Because inequalities can be caused either intentionally or unintentionally, the Supreme Court has decided that the Equal Protection Clause itself does not forbid governmental policies that unintentionally lead to racial disparities, though Congress may have some power under other clauses of the Constitution to address unintentional disparate impacts. This subject was addressed in the seminal case of Arlington Heights v. Metropolitan Housing Corp. (1977). In that case, the plaintiff, a housing developer, sued a city in the suburbs of Chicago that had refused to re-zone a plot of land on which the plaintiff intended to build low-income, racially integrated housing. On the face, there was no clear evidence of racially discriminatory intent on the part of Arlington Heights's planning commission. The result was racially disparate, however, since the refusal supposedly prevented mostly African-Americans and Hispanics from moving in. Justice Lewis Powell, writing for the Court, stated, "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." Disparate impact merely has an evidentiary value; absent a "stark" pattern, "impact is not determinative."[76]

The result in Arlington Heights was similar to that in Washington v. Davis (1976), and has been defended on the basis that the Equal Protection Clause was not designed to guarantee equal outcomes, but rather equal opportunities; if a legislature wants to correct unintentional but racially disparate effects, it may be able to do so through further legislation.[77] It is possible for a discriminating state to hide its true intention, and one possible solution is for disparate impact to be considered as stronger evidence of discriminatory intent.[78] This debate, though, is currently academic, since the Supreme Court has not changed its basic approach as outlined in Arlington Heights.

For an example of how this rule limits the Court's powers under the Equal Protection Clause, see McClesky v. Kemp (1987). In that case a black man was convicted of murdering a white police officer

Pro Se 2 (Rev. 12/16) Complaint and Request for Injunction

and sentenced to death in the state of Georgia. A study found that killers of whites were more likely to be sentenced to death than were killers of blacks.[79] The Court found that the defense had failed to prove that such data demonstrated the requisite discriminatory intent by the Georgia legislature and executive branch.

The "Stop and Frisk" policy in New York allows officers to stop anyone who they feel looks suspicious. Data from police stops shows that even when controlling for variability, people who are black and those of Hispanic descent were stopped more frequently than white people, with these statistics dating back to the late 1990s. A term that has been created to describe the disproportionate number of police stops of black people is "Driving While Black." This term is used to describe the stopping of innocent black people who are not committing any crime.

In addition to concerns that a discriminating statute can hide its true intention, there have also been concerns that facially neutral evaluative and statistical devices that are permitted by decision-makers can be subject to racial bias and unfair appraisals of ability.'[80] As the equal protection doctrine heavily relies on the ability of neutral evaluative tools to engage in neutral selection procedures, racial biases indirectly permitted under the doctrine can have grave ramifications and result in 'uneven conditions.' '[80][81] These issues can be especially prominent in areas of public benefits, employment, and college admissions, etc.'

15th Amendment to the U.S. Constitution: Voting Rights (1870)

Passed by Congress February 26, 1869, and ratified February 3, 1870, the 15th Amendment granted African American men the right to vote.

To former abolitionists and to the Radical Republicans in Congress who fashioned Reconstruction after the Civil War, the 15th Amendment, enacted in 1870, appeared to signify the fulfillment of all promises to African Americans. Set free by the 13th amendment, with citizenship guaranteed by the 14th Amendment, Black males were given the vote by the 15th Amendment. In retrospect, it can be seen that the 15th Amendment was in reality only another step in the struggle for equality that would continue for more than a century before African Americans could begin to participate fully in American public and civic life.

African Americans exercised the right to vote and held office in many Southern states through the 1880s, but in the early 1890s, steps were taken to ensure subsequent "white supremacy." Literacy tests for the vote, "grandfather clauses" excluding from the franchise all whose ancestors had not voted in the 1860s, and other devices to disenfranchise African Americans were written into the laws of former Confederate states.

Social and economic segregation were added to Black America's loss of political power. In 1896, the Supreme Court decision Plessy v. Ferguson legalized "separate but equal" facilities for the races. For more than 50 years, the overwhelming majority of African American citizens were reduced to second-class citizenship under the "Jim Crow" segregation system. During that time, African Americans sought to secure their rights and improve their position through organizations such as National Association for the Advancement of Colored People and the National Urban League and through the individual efforts of reformers like Booker T. Washington, W.E.B. DuBois, and A. Philip Randolph.

The most direct attack on the problem of African American disenfranchisement came in 1965. Prompted by reports of continuing discriminatory voting practices in many Southern states, President Lyndon B. Johnson, himself a southerner, urged Congress on March 15, 1965, to pass legislation "which will make it impossible to thwart the 15th Amendment." He reminded Congress that "we cannot have government for all the people until we first make certain it is government of and by all the people."

The Voting Rights Act of 1965, extended in 1970, 1975, and 1982, abolished all remaining deterrents to exercising the right to vote and authorized federal supervision of voter registration where necessary. In 2013, the Supreme Court struck down a key provision of the act involving federal oversight of voting rules in nine states.

Pro Se 2 (Rev. 12/16) Complaint and Request for Injunction

**B.    If the Basis for Jurisdiction Is Diversity of Citizenship**

1.    The Plaintiff(s)

    a.    If the plaintiff is an individual

        The plaintiff, *(name)*  Emmanuel ,Sarah  and John Adeyinka        , is a citizen of the

        State of *(name)*    Texas                    .

    b.    If the plaintiff is a corporation

        The plaintiff, *(name)*                        , is incorporated

        under the laws of the State of *(name)*                    ,

        and has its principal place of business in the State of *(name)*

                                .

*(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2.    The Defendant(s)

    a.    If the defendant is an individual

        The defendant, *(name)*                    , is a citizen of

        the State of *(name)*                    . Or is a citizen of

        *(foreign nation)*                .

    b.    If the defendant is a corporation

        The defendant, *(name)*    Texas Vital Statistics        , is incorporated under

        the laws of the State of *(name)*    Texas            , and has its

        principal place of business in the State of *(name)*    Texas        .

        Or is incorporated under the laws of *(foreign nation)*    Texas        ,

        and has its principal place of business in *(name)*    Austin        .

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3.    The Amount in Controversy

    The amount in controversy–the amount the plaintiff claims the defendant owes or the amount at stake–is more than $75,000, not counting interest and costs of court, because *(explain)*:

Basic on exactly when the unlawful profiling occurred, 30.7 million for each year, becase
HEALTH AND SAFETY CODE

TITLE 3. VITAL STATISTICS

CHAPTER 195. ENFORCEMENT OF VITAL STATISTICS REPORTING

Sec. 195.001. ENFORCEMENT OF TITLE; REPORTS BY LOCAL REGISTRAR. (a) The local registrar in each local registration district shall enforce this title under the supervision and direction of the state registrar.
(b) A local registrar shall report immediately to the state registrar a violation of this title of which the local registrar has knowledge by observation, by complaint of another person, or by other means.

Acts 1989, 71st Leg., ch. 678, Sec. 1, eff. Sept. 1, 1989.


Sec. 195.002. SUPERVISION AND INVESTIGATION BY STATE REGISTRAR. (a) The state registrar shall execute this title throughout the state. To ensure uniform compliance with this title, the state registrar has supervisory power over local registrars, deputy registrars, and subregistrars.
(b) The state registrar or the state registrar's representative may investigate cases of irregularity or violations of law. On request, any other registrar shall aid in the investigation.
(c) If the state registrar considers it necessary, the state registrar shall report a violation of this title to the appropriate district or county attorney for prosecution. The report must include a statement of the facts and circumstances. The district or county attorney shall immediately initiate and promptly follow up the necessary court proceedings against the person or corporation responsible for the alleged violation.
(d) On the request of the state registrar, the attorney general shall assist in enforcing this title.

Acts 1989, 71st Leg., ch. 678, Sec. 1, eff. Sept. 1, 1989.


Sec. 195.003. FALSE RECORDS. (a) A person commits an offense if the person intentionally or knowingly makes a false statement or directs another person to make a false statement in:
(1) a certificate, record, or report required under this title;
(2) an application for an amendment of a certificate, record, or report required under this title;
(3) an application for a delayed birth certificate or delayed death certificate; or
(4) an application for a certified copy of a vital record.
(b) A person commits an offense if the person intentionally or knowingly supplies false information, or intentionally or knowingly creates a false record, or directs another person to supply false information or create a false record, for use in the preparation of a certificate, record, report, or amendment under this title.
(c) A person commits an offense if the person, without lawful authority and with intent to deceive, makes, counterfeits, alters, amends, or mutilates or directs another person to make, counterfeit, alter, amend, or mutilate:
(1) a certificate, record, or report required under this title; or
(2) a certified copy of a certificate, record, or report required under this title.
(d) A person commits an offense if the person, for purposes of deception, intentionally or knowingly obtains, possesses, uses, sells, or furnishes, or attempts or directs another person to attempt to obtain, possess, use, sell, or furnish a certificate, record, or report required under this title, or a certified copy of a certificate, record, or report required under this title, if the document:

(1) is made, counterfeited, altered, amended, or mutilated without lawful authority and with intent to deceive;

(2) is false in whole or in part; or

(3) relates to the birth of another individual.

(e) A person commits an offense if the person intentionally or knowingly fraudulently identifies himself or herself to obtain or return registration forms, certificates, or any other forms required under this title.

(f) An offense under this section is a felony of the third degree.

(g) In this section, "person" means an individual, corporation, or association.

(h) If a person is convicted of an offense under this section, the court shall order as a condition of probation that the person cannot obtain a certificate, record, or report to which this section applies or practice midwifery, and the Texas Department of Criminal Justice shall require as a condition of parole that the person cannot obtain a certificate, record, or report to which this section applies or practice midwifery.

Acts 1989, 71st Leg., ch. 678, Sec. 1, eff. Sept. 1, 1989. Amended by Acts 1991, 72nd Leg., 1st C.S., ch. 15, Sec. 5.15, eff. Sept. 1, 1991.

Sec. 195.004. FAILURE TO PERFORM DUTY. (a) A person commits an offense if the person refuses or fails to furnish correctly any information in the person's possession affecting a certificate or record required under this title.

(b) A person commits an offense if the person fails, neglects, or refuses to fill out a birth or death certificate and to file the certificate with the local registrar or deliver it on request to the person with the duty to file it, as required by this title.

(c) A local registrar, deputy registrar, or subregistrar commits an offense if that person fails, neglects, or refuses to perform a duty under this title or under instructions and directions of the state registrar given under this title.

(d) Except as provided by Subsection (d-1), an offense under this section is a Class C misdemeanor.

(d-1) An offense under this section for failure to perform a duty required by Section 192.003 is a Class A misdemeanor.

(e) In this section, "person" means an individual, corporation, or association.

Acts 1989, 71st Leg., ch. 678, Sec. 1, eff. Sept. 1, 1989.
Amended by:
Acts 2011, 82nd Leg., R.S., Ch. 222 (H.B. 253), Sec. 3, eff. September 1, 2011.

Sec. 195.005. DISCLOSURE OF CONFIDENTIAL INFORMATION. (a) A person commits an offense if the person knowingly violates Section 192.002(b), knowingly induces or causes another to violate that section, or knowingly fails to comply with a rule adopted under that section.

(b) An offense under this section is a Class A misdemeanor.

Added by Acts 1991, 72nd Leg., ch. 14, Sec. 62, eff. Sept. 1, 1991.

Sec. 9. SEARCHES AND SEIZURES. The people shall be secure in their persons, houses, papers and possessions, from all unreasonable seizures or searches, and no warrant to search any place, or to seize any person or thing, shall issue without describing them as near as may be, nor without probable cause, supported by oath or affirmation. (Feb. 15, 1876.)

Sec. 19. DEPRIVATION OF LIFE, LIBERTY, PROPERTY, ETC. BY DUE COURSE OF LAW. No citizen of this State shall be deprived of life, liberty, property, privileges or

immunities, or in any manner disfranchised, except by the due course of the law of the land. (Feb. 15, 1876.)

Sec. 56. PROHIBITED LOCAL AND SPECIAL LAWS. (a)  The Legislature shall not, except as otherwise provided in this Constitution, pass any local or special law, authorizing:
(9)  authorizing the adoption or legitimation of children;
Sec. 57. NOTICE OF INTENTION TO APPLY FOR LOCAL OR SPECIAL LAW. No local or special law shall be passed, unless notice of the intention to apply therefor shall have been published in the locality where the matter or thing to be affected may be situated, which notice shall state the substance of the contemplated law, and shall be published at least thirty days prior to the introduction into the Legislature of such bill and in the manner to be provided by law. The evidence of such notice having been published, shall be exhibited in the Legislature, before such act shall be passed.

Sec. 62. CONTINUITY OF STATE AND LOCAL GOVERNMENTAL OPERATIONS FOLLOWING ENEMY ATTACK. (a)  The Legislature, in order to insure continuity of state and local governmental operations in periods of emergency resulting from disasters caused by enemy attack, shall have the power Art. III Sec. 62 71 and the immediate duty to provide for prompt and temporary succession to the powers and duties of public offices, of whatever nature and whether filled by election or appointment, the incumbents of which may become unavailable for carrying on the powers and duties of such offices. Provided, however, that Article I of the Constitution of Texas, known as the "Bill of Rights" shall not be in any manner affected, amended, impaired, suspended, repealed or suspended hereby. (b)  When such a period of emergency or the immediate threat of enemy attack exists, the Legislature may suspend procedural rules imposed by this Constitution that relate to:

Sec. 66. LIMITATION OF LIABILITY FOR NONECONOMIC DAMAGES. (a)  In this section "economic damages" means compensatory damages for any pecuniary loss or damage. The term does not include any loss or damage, however characterized, for past, present, and future physical pain and suffering, mental anguish and suffering, loss of consortium, loss of companionship and society, disfigurement, or physical impairment.
(b)  Notwithstanding any other provision of this constitution, the legislature by statute may determine the limit of liability for all damages and losses, however characterized, other than economic damages, of a provider of medical or health care with respect to treatment, lack of treatment, or other claimed departure from an accepted standard of medical or health care or safety, however characterized, that is or is claimed to be a cause of, or that contributes or is claimed to contribute to, disease, injury, or death of a person. This subsection applies without regard to whether the claim or cause of action arises under or is derived from common law, a statute, or other law, including any claim or cause of action based or sounding in tort, contract, or any other theory or any combination of theories of liability. The claim or cause of action includes a medical or health care liability claim as defined by the legislature
(c)  Notwithstanding any other provision of this constitution, after January 1, 2005, the legislature by statute may determine the limit of liability for all damages and losses, however characterized, other than economic damages, in a claim or cause of action not covered by Subsection (b) of this section. This subsection applies without regard to whether the claim or cause of action arises under or is derived from common law, a statute, or other law, including any claim or cause of action based or sounding in tort, contract, or any other theory or any combination of theories of liability

Pro Se 2 (Rev. 12/16) Complaint and Request for Injunction

## III.    Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the injunction or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A.    Where did the events giving rise to your claim(s) occur?

Texas health and human service on 4/13/20231 I request for correction of my parent race to be updated, the request # number is P 187158, -59 the processor name is Dawn k martin, this request was for change of partner race, my partner race was listed as Negroid

B.    What date and approximate time did the events giving rise to your claim(s) occur?

4/13/20231

C.    What are the facts underlying your claim(s)? *(For example: What happened to you? Who did what? Was anyone else involved? Who else saw what happened?)*

Texas health and human service on 4/13/20231 I request for correction of my parent race to be updated, the request # number is P 187158, -59 the processor name is Dawn k martin, this request was for change of partner race, my partner race was listed as Negroid a race profiles, Texas health and human services, believe it was done at the time of birth. But I have evidence that It wasn't, it sometime 1999 thought 2010 or when I live in Philadelphia, or when I lost my birth certificate, they have different rule to change your parents race , not only they wanted me to paid, for these error which was done from birth , Texas constitution should provide a lawyer to suit the hospital, Texas health and human service looking for more of a repose out me,  then correcting or resolve the issue, I send them a copy of my ID and a copy of my birth certificate, that listed my race on my ID, why not just listed as my race on my ID, also birth place they list my mother as Harris and my father Birth Place as Affica, so hooly if it Error Happen when I was Born I think not.

## IV.    Irreparable Injury

Explain why monetary damages at a later time would not adequately compensate you for the injuries you sustained, are sustaining, or will sustain as a result of the events described above, or why such compensation could not be measured.

} Fourth Amendment "papers" may be pamphlets and letters in hard copy, or they may be digital files stored on a cell phone, hosted in "the cloud," or even generated by a third party. Of course, not all third-party records have significant expressive or associate  Negroid is (less commonly called Congoid) is an obsolete racial grouping of various people indigenous to Africa south of the area which stretched from the southern Sahara desert in the west to the African Great Lakes in the southeast,[1] but also to isolated parts of South and Southeast Asia (Negritos).[2] The term is derived from now-disproven conceptions of race as a biological category.[3] The concept of dividing humankind into three races called Caucasoid, Mongoloid, and Negroid (originally named "Ethiopian") was introduced in the 1780s by members of the Göttingen School of History and further developed by Western scholars in the context of "racist ideologies" during the age of colonialism.[4]With the rise of modern genetics, the concept of distinct human races in a biological sense has become obsolete. In 2019, the American Association of Biological Anthropologists stated: "Race does not provide an accurate representation of human biological variation. It was never accurate in the past, and it remains inaccurate when referencing contemporary human populations."[4] unlawful profiling Basic on exactly when the unlawful profiling occurred, 30.7 million for each year, that is each year that the unlawful profiling was listed in Texas record system since 1980, that between 3 plaintiff me Emmanuel Adeyinka, Sarah Adeyinka, and John Adeyinka not adding pain and suffering and restitution claim. Cases related also see in US District Court for the District of Oregon, Adeyinka v. Perfect Privacy, LLC, filed April 27, 2023 and also Adeyinka v. Fagbolu et al , in US District Court for the Southern District of Texas , filed , June 15, 2018 , defendant never answer the subpoena , I the plaintiff claim a stocking and extortion and 4 amendment violation , and the company been leasing the domain to christopher fagbolu,christopher fagbolu been buying my last name domain since 2003 me and the court still like to know why . I Plea the 5 amendment for which in biblically terminology your partner carries a wage of sin, in acts their economical strategy, and manipulating strategy my birth day is 8/2/80, reality of my issue,  Music company Columbia recorder and rapper 50 cents, produce an album It not your birthday.,and like these application  Link https://www.dshs.texas.govAfltal-statistics/requirements-requestingichanging-vital-records/supporting- documentation-record-changes#diildinfo Correct parent's Information {of parent currently listed on the birth certificate) Submit ONE (1) of the following documents: Certified copy of a court order affecting the Information shown on the birth certificate; Birth certificate{s) of child's parent{s); Birth certificate of child's older brother or sister; Certified copy of parents 'marriage license; Parent's naturalization certificate (must include name change); OR Photocopy of parent's domestic passport or parent's foreign passport with U.S. Vis , Which is a coincidence how believe in coincidence , I'm Not your Negro , James Baldwin said his  date of birth is 8/2/1924 to 1987 , when I first acknowledge I my parent race on my birth card , is stated as Negroid , I reported to DOJ ,2 in half year ago , I watch the economy changes Black life matter, also I plea the 5 ,and 14 , 15 amendment in justice of my source of culturally existence, if one  can produce their everyday life in the proper constitutional manor, why should i Produce The Document , in  my mind they said they need to make the change for their self-gain they can't going  with their daily life without it ,for example: ,my juvenile recorder  When I was 15 years old, for example : link {,Calvin Sanford } https://www.fox13news.com/news/judge-denies-bond-for-teen-accused-in-deadly-crash-following-high-speed-chase-in-stolen-truck    , I couldn't find these case but these the link , also report these to DOJ being it case related , when I was  15 year old , manipulating strategy  of their economic strategy and  pattern of practice, Joe Ligon , I couldn't find the case# but these is the link: :https://en.m.wikipedia.org/wiki/Joe_Ligon#:~:text=Upon%20his%20release%2C%20Ligon%20became,%2Fye ar)%20to%20incarcerate%20him , {Joseph Ligon }(born 1937 or 1938) is an American convicted murderer and former prisoner. He was America's longest-serving prisoner who was convicted to a life sentence as a minor. At 15, he was found guilty of murder by association and sentenced to life in prison without the possibility of parole. After the US Supreme Court had ruled in 2016 that all juvenile life sentences without parole were retroactively unconstitutional, he was released in 2021, having spent 68 years in jail. , the release of joseph and arrested of Calvin was month apart , that isn't a coincidence, when did the option become available to change or to amended your partner race, it was a research team in Connecticut, don't forget these is discriminated issue and they should offer to corrected this matter. But what I leaner from it, it an outlet for trafficking, and political transactions and creating constitution error economic strategy to bring admissible clause and prejudice judgement in cases filing, I plea of the 4 amendment of the Constitution of Orogen and United State Constitution be rectified. I also plea for 15 amendment, the right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

Pro Se 2 (Rev. 12/16) Complaint and Request for Injunction

## V.    Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

my birth is 8/2/1980 Basic on exactly when the unlawful profiling occurred, 30.7 million for each year, my Birthday

and produce the ordinary or original copy with fingerprints and footprints

## VI.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:    9/18/23

Signature of Plaintiff

Printed Name of Plaintiff    Emmanuel Adeyinka

### B.    For Attorneys

Date of signing:

Signature of Attorney

Pro Se 2 (Rev. 12/16) Complaint and Request for Injunction

Printed Name of Attorney _____

Bar Number _____

Name of Law Firm _____

Street Address _____

State and Zip Code _____

Telephone Number _____

E-mail Address _____

# CERTIFICATION VITAL RECORD

## DEPARTMENT OF STATE HEALTH SERVICES
## VITAL STATISTICS

TEXAS DEPARTMENT OF HEALTH
REC'D OCT 27 1980
STATE BUREAU OF VITAL STATISTICS

CERTIFICATE OF BIRTH

BIRTH NO. 142-80-189623

| | | |
|---|---|---|
| 1. NAME [Type or print] (a) First: EMMANUEL | (b) Middle: ALE | (c) Last: ADEYINKA |
| 2. DATE OF BIRTH: AUGUST 12, 1980 | | |
| 3. SEX: MALE | 4a. PLACE OF BIRTH — COUNTY: HARRIS | 4b. CITY OR TOWN (if outside city limits, give precinct no.): HOUSTON |
| 4c. NAME OF HOSPITAL (If not in hospital, give street address): SPRING BRANCH MEMORIAL HOSPITAL | 4d. INSIDE CITY LIMITS? YES | 5a. THIS BIRTH-SINGLE, TWIN, TRIPLET, ETC. (Specify): SINGLE / 5b. IF TWIN OR TRIPLET, WAS CHILD BORN 1st, 2nd, 3rd (Specify) |

**FATHER**

| | | |
|---|---|---|
| 6. NAME (a) First: JOHN | (b) Middle: OLALEKAN | (c) Last: ADEYINKA |
| 7. RACE: NEGROID | 8a. IS FATHER OF SPANISH ORIGIN? NO | 8b. IF YES, SPECIFY MEXICAN, CUBAN, PUERTO RICAN, ETC. |
| 9. AGE (At time of this birth): 27 | 10. BIRTHPLACE (State or foreign country): AFRICA | 11a. USUAL OCCUPATION: MACHINIST  11b. KIND OF BUSINESS OR INDUSTRY: TOOL COMPANY |

**MOTHER**

| | | |
|---|---|---|
| 12. MAIDEN NAME (a) First: SARAH | (b) Middle: JEANETTE | (c) Last: MAY |
| 13. RACE: NEGROID | 14a. IS MOTHER OF SPANISH ORIGIN? NO | 14b. IF YES, SPECIFY MEXICAN, CUBAN, PUERTO RICAN, ETC. |
| 15. AGE (At time of this birth): 20 | 16. BIRTHPLACE (State or foreign country): TEXAS | 17a. USUAL OCCUPATION: CASHIER  17b. KIND OF BUSINESS OR INDUSTRY: GROCERY STORE |
| 18a. RESIDENCE — STATE: TEXAS | 18b. COUNTY: HARRIS  18c. CITY OR TOWN (If outside city limits, show rural): HOUSTON  ZIP CODE: 77055 | 18d. STREET ADDRESS (If rural, give location): 1855 WIRT #281  18e. INSIDE CITY LIMITS? YES |

| 19. Children previously born to this mother (Do, NOT include this birth) a. How many other children are now living? 1 | b. How many other children were born alive but are now dead? 1 | c. How many children were born dead after 20 weeks pregnancy? 0 | 20. INFORMANT: Sarah J Adeyinka |
|---|---|---|---|

| 21. I hereby certify that this child was born alive on the date stated above. at 3:23 P. M. | 22a. ATTENDANT'S SIGNATURE | 22b. ATTENDANT AT BIRTH M.D. D.O C.N.M., MIDWIFE, OTHER (Specify) M.D. |
|---|---|---|
| | 22c. ATTENDANT'S ADDRESS  DOUGLAS THIBODEAUX, M.D.  9320 WESTVIEW, HOUSTON, TEXAS 77055 | 22d. DATE SIGNED: AUGUST 12, 1980 |
| 23a. REGISTRAR'S FILE NO. 25738 | 23b. DATE REC'D BY LOCAL REGISTRAR: AUG. 7, 1980 | 23c. SIGNATURE OF LOCAL REGISTRAR |



LYN/

This is a true and correct copy of the record as registered in the State of Texas. Issued under the authority of Section 191.051, Health and Safety Code.

ISSUED  DEC 17 2019

TARA DAS
STATE REGISTRAR

WARNING: THIS DOCUMENT HAS A DARK BLUE BORDER
ANY ALTERATION OF BACKGROUND IS THIS CERTIFICATE

THE STATE OF TEXAS

